STATE OF NEBRASKA, APPELLEE, V.
BRANDY M. BLAIR, APPELLANT.
726 N.W.2d 185

Filed January 19, 2007.   No. S-05-544.

Dennis R. Keefe, Lancaster County Public Defender, Robert G. Hays, and Timothy M. Eppler for appellant.

Jon Bruning, Attorney General, and James D. Smith for appellee.

HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

WRIGHT, J.

## NATURE OF CASE

Brandy M. Blair (Blair) was convicted of intentional child abuse resulting in the death of her 22-month-old son and was sentenced to 30 to 40 years in prison. On June 9, 2004, Christian L. Reifler (Christian) was found dead in the Lincoln, Nebraska, residence where he and Blair lived. It appeared that Christian had placed a staple in an electrical outlet and had been electrocuted. The jury was instructed that it could find Blair (1) guilty of intentional child abuse resulting in death, (2) guilty of intentional child abuse, or (3) not guilty. Blair's request for an instruction on negligent child abuse was refused. She appeals her conviction and sentence. We reverse, and remand for a new trial.

## SCOPE OF REVIEW

Whether a crime is a lesser-included offense is determined by a statutory elements approach and is a question of law. *State v. Molina*, 271 Neb. 488, 713 N.W.2d 412 (2006). Whether jury instructions given by a trial court are correct is a question of law. *State v. Iromuanya*, ante p. 178, 719 N.W.2d 263 (2006). When dispositive issues on appeal present questions of law, an appellate court has an obligation to reach an independent conclusion irrespective of the decision of the court below. *Id.*

## FACTS

### BACKGROUND

At the time of Christian's death, Blair's brother Jason Blair (Jason), Elizabeth Frederick (Liz), Joshua Jones (Josh), and

Edward Simpson, Jr. (Eddie), were living in the house with Blair and Christian. The three bedrooms upstairs were used by Blair, Jason, and Christian. Testimony was offered that during the 3 days preceding Christian's death, Blair was visiting friends and smoking methamphetamine, and that she did not see Christian between Monday evening, June 7, 2004, and Wednesday morning, June 9.

## MONDAY, JUNE 7, 2004

On Monday, June 7, 2004, Jason, Josh, and Eddie left the house at 6:30 a.m. to look for work with a temporary employment agency. The landlord came to the house at about 8:30 or 9 a.m. to paint the windowsills inside the house, and Christian came downstairs while the landlord was painting. At 1:45 p.m., Blair, Christian, and Blair's friend, Melissa Jones (Melissa), accompanied Liz to a doctor's appointment. The group later returned so Christian could take a nap. Blair changed Christian's diaper, dressed him in shorts, put him in his crib, and closed the door to his room. She left with Melissa to run errands and asked Liz to watch Christian for a couple of hours.

At some time during the day, Liz made nachos for Christian, and he ate them in the dining room. When Blair and Melissa returned at 5 p.m., Blair went to Christian's room, changed his diaper, and took him downstairs. Jason and Eddie returned to the house at around 5 or 5:30 p.m., and each showered in the upstairs bathroom. At that time, Eddie noticed the door to Christian's room was closed. Blair said that she fed Christian a hamburger and mashed potatoes at about 5:30 p.m. and that he drank about 18 ounces of water.

Jason and Eddie left to go to a bar at 7:30 or 8 p.m. Blair changed Christian's diaper and put him to bed in his crib between 8 and 8:30 p.m. The railing of the crib had been removed because Christian was climbing over it and Blair did not want him to fall or get his leg caught. Blair left the house with Melissa at about 9 p.m., while Jason, Josh, Liz, Eddie, and a friend remained at the house watching television. Blair said she told "everybody who was listening to [her]" that she was leaving for a little bit. She did not specifically ask anyone to check on Christian. She said that usually no one checked on him at

night because if his bedroom door was opened, he would wake up and not go back to sleep.

Liz did not see Christian downstairs between 6 and 11 p.m. When Liz went upstairs to shower at 10 p.m., she saw that the door to Christian's room was closed, with a towel above the door. (Blair said she placed the towel there because Christian had learned how to open the door, and he sometimes got up earlier than the adults. Blair wanted to prevent him from "getting into the bathroom and getting into stuff he wasn't suppose[d] to.") Liz knocked on Blair's door and got no response. She tried to open the door, but it was locked from the inside. Liz went to bed at about 11 p.m.

### Tuesday, June 8, 2004

When Jason and Eddie returned to the house around 12:30 or 1 a.m. Tuesday, neither saw Blair. Blair said she and Melissa went to Melissa's house, which was two houses east of Blair's house, at about 4 a.m. They smoked a rock of methamphetamine, and Blair stayed there the rest of the night.

On Tuesday morning, Jason and Eddie did not see Blair. Jason said he did not check on Christian. Eddie watched television with Josh and Liz. Liz did not leave the house on Tuesday and did not see or hear Christian or Blair all day. The door to Blair's room was open, but no one was inside, and the door to Christian's room was closed with a towel over the top of it. Josh said he heard Christian crying at some point. Josh opened the door, checked on Christian, closed the door, and went back downstairs. That afternoon, Liz told Melissa to tell Blair she needed to come home because Liz could not care for Christian alone and the men needed to go to work. Melissa gave Blair the message.

Jason was gone from the house that afternoon and then left again around 8:30 p.m. to go to a bar with Eddie. Jason did not see Blair at the house that day. Before Jason left, he opened the door to Christian's room and found Christian playing on the floor with some toys. Eddie said he saw Blair in the living room sometime that evening, but he did not see Christian or have any conversation with Blair about Christian. The door to Christian's room was closed when Eddie went upstairs to shower.

Blair said she sent a text message to Eddie's telephone at about 5 p.m., stating, "I'm fine. . . . I'll be home later, later tonight and . . . tell Liz sorry and thank you for watching Bubba." Liz said that Eddie gave her Blair's message at about 9 p.m. The message came as a surprise because she "had no clue" she was supposed to be caring for Christian. Liz heard Christian playing in his room and gave him a drink of water sometime between 9 and 10:30 p.m. Blair and Melissa spent the day visiting friends and eventually returned to Melissa's house at about 9:30 p.m.

### WEDNESDAY, JUNE 9, 2004

Between midnight and 2:30 a.m., Melissa, Blair, and Eddie visited at Melissa's house and ended up on the porch of Blair's house. Jason arrived at about 1:30 a.m. Blair did not check on Christian during this period. Jason and Eddie went to bed at 2:30 a.m., and Blair and Melissa returned to Melissa's house, where they talked until about 3:30 a.m. Blair spent the remainder of the night there.

During the morning hours, Jason, Josh, Liz, and Eddie talked and watched television. At some point, Jason thought he heard Christian "rustling around," and Josh said he thought he heard a thumping sound, as if Christian were playing. Blair arrived home at 10:15 a.m. and went upstairs to check on Christian. According to Blair, Christian was sleeping on his stomach on the floor by his crib wearing a diaper. The diaper was not very wet, so she covered him with a light blanket and placed a stuffed animal next to him. She shut the door, went downstairs, and awakened Eddie. She did not ask any of the adults whether they had fed Christian or changed his diaper.

Blair and Eddie watched three movies over a 5-hour timespan, during which Blair did not check on Christian or see anyone else check on him. Eddie and Jason went to a pawnshop at about 4 p.m. While there, Eddie received a telephone call from Blair asking if he and Jason would watch Christian while she went to a lake with a friend. Blair said Eddie agreed as long as she was home by 7 p.m. When Jason and Eddie returned home, Blair told Jason that if he and Eddie wanted to go out later, Josh and Liz could watch Christian until Blair got home. Liz said Blair asked her to watch Christian if she was not home by the

time Eddie and Jason left for the bar. Josh said he told Blair to go upstairs and check on Christian, give him something to drink, and change his diaper before she left.

Blair went upstairs, and when she came back downstairs, Eddie asked if she had checked on Christian. Blair said he was fine. Liz also testified that Blair had checked on Christian and told Liz he was fine. Eddie said that when Blair left, she looked at everyone and asked if they would keep an eye on Christian while she went to the lake. When Blair left the house, Jason, Josh, Liz, and Eddie were all present.

Josh cooked dinner, and 30 to 45 minutes after Blair left, he asked Jason and Eddie to go get Christian. Eddie opened the door to Christian's bedroom and found Christian lying still on the floor. Eddie screamed that Christian was not moving or breathing, and he ran back downstairs to call the 911 emergency dispatch service. Ricky Janousek (Ricky), who had come to the house for dinner, had taken CPR classes, and he gave Christian CPR. When Ricky reached under Christian's left arm to roll him over, Christian was "cold and wasn't very limber." Ricky, Josh, and Liz left to find Blair. Meanwhile, Blair discovered she had missed two calls from Eddie. She returned them and was informed by Jason of Christian's death.

A call to 911 was received at 5:42 p.m. Peter Eppens, a fire-fighter paramedic, found Christian face down in his room. He had no pulse, and rigor mortis had set in. Eppens testified that rigor mortis usually occurs between 4 to 6 hours after death. Eppens saw what he believed to be burns on the index finger and second finger of Christian's left hand.

An autopsy determined that Christian died from electrocution. The chief electrical inspector for the city of Lincoln and Lancaster County stated that the electrocution appeared to have occurred when Christian's hands were both on a staple that was inserted into an outlet. Evidence was presented that an infant could be electrocuted by as little as 14 milliamps of current flow across the chest to stop the heart. Christian was also severely dehydrated at the time of his death.

Jason and Eddie testified that they did not care for Christian between June 7 and 9, 2004. Liz fixed him nachos on Monday at noon and gave him a drink on Tuesday night but provided no

other care during the 3-day period. Blair said she "[j]ust assumed" that someone else had fed Christian while she was gone because "[t]hey've all taken care of him before . . . ."

## ASSIGNMENTS OF ERROR

Blair claims the trial court erred in failing to instruct the jury that negligent child abuse is a lesser-included offense of intentional child abuse and in failing to instruct on the definition of negligence.

## ANALYSIS

The dispositive issue is whether an instruction on negligent child abuse was warranted by the evidence. Negligent child abuse is a lesser-included offense of intentional child abuse resulting in death. See *State v. Molina*, 271 Neb. 488, 713 N.W.2d 412 (2006). The jury was instructed that it could find Blair guilty of intentional child abuse resulting in death, guilty of intentional child abuse, or not guilty. The trial court gave the following elements instruction:

Regarding intentional child abuse resulting in death, the elements of the state's case are:

1. That the defendant, Brandy M. Blair, caused or permitted Christian Lee Reifler to be placed in a situation that endangered his life or physical health; or to be cruelly confined; or to be deprived of necessary food or care;

2. That the defendant did so knowingly and intentionally;

3. That the defendant did so on, about or between June 7, 2004[,] and June 9, 2004, in Lancaster County, Nebraska;

4. That at the time defendant did so, Christian Lee Reifler was a minor child; and

5. That as a result of the above, Christian Lee Reifler died.

Regarding intentional child abuse, the elements of the state's case are:

1. That the defendant, Brandy M. Blair, caused or permitted Christian Lee Reifler to be placed in a situation that endangered his life or physical health; or to be cruelly confined; or to be deprived of necessary food or care;

2. That the defendant did so intentionally and knowingly;

3. That the defendant did so on, about or between June 7, 2004[,] and June 9, 2004, in Lancaster County, Nebraska;

4. That at the time defendant did so, Christian Lee Reifler was a minor child.

The jury was given a step instruction and directed to first consider the crime of intentional child abuse resulting in death. If the State did not prove each element beyond a reasonable doubt, the jury was to proceed to the crime of intentional child abuse. If that crime was not so proved, then the jury was directed to find Blair not guilty of either crime.

Blair proposed a jury instruction that included possible verdicts of intentional child abuse resulting in death, intentional child abuse, and negligent child abuse. The proposed instruction also included step instruction language. The trial court refused to give the proposed instruction including negligent child abuse and refused to give an instruction defining negligence.

This court has held that negligent child abuse and intentional child abuse are lesser-included offenses of child abuse resulting in serious bodily injury and child abuse resulting in death. See *State v. Molina, supra.* "The proscribed conduct for each offense is exactly the same; it is the actor's state of mind which differentiates the offenses. If the abuse is committed knowingly and intentionally, it is a felony; if committed negligently, it is a misdemeanor." *State v. Parks*, 253 Neb. 939, 947, 573 N.W.2d 453, 459 (1998).

■ A court must instruct on a lesser-included offense if (1) the elements of the lesser offense for which an instruction is requested are such that one cannot commit the greater offense without simultaneously committing the lesser offense and (2) the evidence produces a rational basis for acquitting the defendant of the greater offense and convicting the defendant of the lesser offense. *State v. Molina*, 271 Neb. 488, 713 N.W.2d 412 (2006); *State v. Parks, supra.*

The rationale for requiring an instruction on a lesser-included offense when the evidence supports such instruction was set forth in *Beck v. Alabama*, 447 U.S. 625, 100 S. Ct. 2382, 65 L. Ed. 2d 392 (1980). The Court quoted *Keeble v. United States*, 412 U.S. 205, 212-13, 93 S. Ct. 1993, 36 L. Ed. 2d 844 (1973), which states:

> [I]f the prosecution has not established beyond a reason-
> able doubt every element of the offense charged, and if
> no lesser offense instruction is offered, the jury must, as a
> theoretical matter, return a verdict of acquittal. But a de-
> fendant is entitled to a lesser offense instruction—in this
> context or any other—precisely because he should not be
> exposed to the substantial risk that the jury's practice will
> diverge from theory. Where one of the elements of the
> offense charged remains in doubt, but the defendant is
> plainly guilty of *some* offense, the jury is likely to resolve
> its doubts in favor of conviction.

(Emphasis in original.)

In the case at bar, Blair could not have committed the offense of intentional child abuse without also having committed the offense of negligent child abuse. The conduct is the same. See *State v. Parks, supra.* Because the first prong of the test set forth in *Molina* has been met, we consider whether the evidence provided a rational basis for acquitting Blair of intentional child abuse and convicting her of negligent child abuse.

We conclude the evidence provided at least a rational basis for the jury to acquit Blair of intentional child abuse and convict her of negligent child abuse. This is not to say that the jury would necessarily have believed the evidence presented by Blair. However, such evidence provided a rational basis for the jury to potentially find that the abuse was committed negligently and not knowingly and intentionally. Five adults were living in the house where the child was electrocuted. On Monday afternoon, June 7, 2004, Christian was placed in his bedroom for a nap. Blair allegedly asked Liz to watch Christian while Blair ran errands. Blair returned later, changed Christian's diaper, and took him downstairs. During the day, he was fed nachos and/or a hamburger and given water to drink. Blair claims that after she put Christian to bed, she told whoever was listening that she was leaving for a little while.

Eddie said he had received a text message from Blair on his cellular telephone at 5 p.m. Tuesday, stating she would be home later that night and asking Eddie to thank Liz for watching Christian. Liz denied that she had been asked to care for

Christian. She gave Christian a drink of water later that evening and heard him playing in his room.

· Blair said Christian was sleeping when she checked on him Wednesday morning, June 9, 2004. She covered him and placed a stuffed animal beside him. She watched movies that afternoon and then called Eddie and Jason to ask them to watch Christian while she went to a lake. Blair asked Liz to watch Christian if she was not home by the time Eddie left. When Blair left for the lake, she asked "everybody who was listening to [her]" if they would keep an eye on Christian and she told Eddie and Liz that she had checked on Christian. Blair said she assumed someone had fed Christian while she was gone because the other adults had all taken care of him before.

In *State v. Parks,* 253 Neb. 939, 573 N.W.2d 453 (1998), the defendant was convicted of knowing or intentional child abuse. The defendant contended that the district court erred in failing to instruct the jury on the offense of negligent child abuse. We concluded the court erred in not instructing on the lesser-included offense of negligent child abuse because the evidence was sufficient to support a finding that the defendant acted negligently rather than knowingly and intentionally.

The intent with which an act is committed may be inferred from the words and acts of the defendant and from the circumstances surrounding the incident. *Id.* There was sufficient evidence that Blair knowingly and intentionally placed Christian in a situation that resulted in his death, but there was also evidence that Blair acted negligently. The proscribed conduct for each offense is exactly the same; it is the actor's state of mind which differentiates the offenses. *Id.* If the abuse is committed negligently, it is a misdemeanor. If the abuse is committed knowingly and intentionally, it is a felony.

Christian died as a result of touching a staple while it was inserted into an electrical outlet. Electrocution appeared to have occurred because both of his hands were touching the staple and current flowed across his chest and stopped his heart. There was evidence that Blair assumed someone in the house was caring for Christian because the adults had taken care of him before. She claimed she had asked the other adults to take care of Christian

while she was away from the house. The evidence was sufficient to warrant a finding by the jury that Blair negligently caused or permitted Christian to be placed in a situation that endangered his life and that as a result, he died.

To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction. *State v. Molina*, 271 Neb. 488, 713 N.W.2d 412 (2006). Before an error in the giving of instructions can be considered as a ground for reversal of a conviction, it must be considered prejudicial to the rights of the defendant. *Id.*

The instructions as given directed the jury to consider whether Blair's intentional actions caused Christian's death. The jury was not directed to consider whether Blair's actions were negligent. The jury was given the choice of determining whether Blair's intentional conduct did or did not result in the death of Christian or of finding that Blair was not guilty. The jury was not permitted to consider whether Blair's conduct was negligent as opposed to intentional. The jury was not permitted to consider whether Blair negligently caused or permitted Christian to be placed in a situation that resulted in his death.

At oral argument, the State claimed that the refusal to give an instruction on negligent child abuse was not prejudicial because the jury had been presented with the issue of intent in other properly given instructions. To address this claim, we consider our recent holding in *Molina*. Germai Molina was convicted of second degree murder and child abuse resulting in death following the death of his 2-year-old daughter. On appeal, Molina claimed that the jury should have been instructed as to the elements of intentional and negligent child abuse as lesser-included offenses of child abuse resulting in death. The instruction was denied, and instead, the jury was instructed that Molina could be found guilty of child abuse resulting in death, guilty of child abuse resulting in serious bodily injury, or not guilty.

The jury was also instructed as to the elements of second degree murder and manslaughter as lesser-included offenses of

first degree murder. The jury was directed that if it found Molina caused the death of his daughter intentionally but without premeditation, it should find him guilty of second degree murder. If the jury found that Molina killed his daughter unintentionally while in the commission of an unlawful act, he should be found guilty of manslaughter.

Molina argued that the jury could have concluded that he was merely negligent in allowing his wife to abuse their daughter and that his wife was responsible for the child abuse. If the jury had reached this conclusion, it could have found him guilty of negligent child abuse.

We determined the court erred in not instructing on negligent child abuse. However, we held that the error was harmless because Molina was also convicted of second degree murder. The jury had been instructed on the elements of first degree murder and the lesser-included offenses of second degree murder and manslaughter. Based on his conviction of second degree murder, it was apparent that the jury had been given the opportunity to decide the issue of Molina's intent. " ' "[E]rror in failing to instruct the jury on a lesser included offense is harmless when the jury necessarily decides the factual questions posed by the omitted instructions adversely to defendant under other properly given instructions." ' " *State v. Molina*, 271 Neb. 488, 520, 713 N.W.2d 412, 441 (2006), quoting *People v. Horning*, 34 Cal. 4th 871, 102 P.3d 228, 22 Cal. Rptr. 3d 305 (2004).

The jury in *Molina* was given the opportunity to determine whether Molina acted with or without intent when it was instructed on the lesser-included offenses of second degree murder and manslaughter. The district court's refusal to instruct on negligent child abuse was not prejudicial because "the jury necessarily rejected the evidence that would support a finding that only the lesser-included offense was committed." *Molina*, 271 Neb. at 521, 713 N.W.2d at 442.

In the case at bar, the jury was not given the opportunity to consider whether Blair acted negligently and the failure to instruct on the elements of negligent child abuse was not harmless error. We therefore reverse the judgment of conviction and remand the cause for a new trial.

## CONCLUSION

The evidence was sufficient to sustain Blair's conviction; however, the trial court's refusal to give a jury instruction that included the lesser-included offense of negligent child abuse was reversible error. The judgment of conviction is reversed, and the cause is remanded for a new trial.

REVERSED AND REMANDED FOR A NEW TRIAL.