IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


STATE V. GRASMICK


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


STATE OF NEBRASKA, APPELLEE,

V.

TIMOTHY J. GRASMICK, APPELLANT.


Filed March 5, 2019.    No. A-18-243.


Appeal from the District Court for Scotts Bluff County: ANDREA D. MILLER, Judge.
Affirmed.

Bernard J. Straetker, Scotts Bluff County Public Defender, for appellant.

Douglas J. Peterson, Attorney General, and Austin N. Relph for appellee.


RIEDMANN, BISHOP, and WELCH, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Following a jury trial in the Scotts Bluff County District Court, Timothy J. Grasmick was convicted of intentional child abuse in violation of Neb. Rev. Stat. § 28-707(4) (Reissue 2016) for his conduct involving his 13-year-old son. He was found not guilty of third degree domestic assault against Stacy Deputy (Stacy), Grasmick's fiance at the time of trial. The district court sentenced Grasmick to 18 months' probation. Grasmick appeals, claiming there was insufficient evidence to support his conviction. We affirm.

## II. BACKGROUND

A criminal complaint was filed against Grasmick in the county court for Scotts Bluff County on October 10, 2017, charging him with child abuse (knowingly and intentionally). His case was bound over to the district court, and an information was filed charging Grasmick with

- 1 -

one count of child abuse (knowingly and intentionally) upon T.G. (Grasmick's son), and one count of third degree domestic assault upon Stacy (T.G.'s mother). The information alleged that each charge arose out of Grasmick's actions in Scotts Bluff County on October 7. Grasmick pled not guilty to the charges contained in the information. A jury trial took place on January 10, 2018.

## 1. STATE'S EVIDENCE

### (a) L.B.'s Testimony

L.B., 15 years old at the time of trial, indicated he had been neighbors with Grasmick and T.G. in the past. According to L.B., on October 7, 2017, he was at a hotel (in Scottsbluff, Nebraska) with his parents Shannon Bishop (Shannon) and Woodrow Pester (Woodrow), his two sisters, Grasmick, Stacy, and T.G. L.B. said they were watching "the football game" in the hotel room and had been at the hotel for "two, three hours"; during the football game, Woodrow and Grasmick were drinking beer. L.B. said that before the incident, T.G. had come back from the swimming pool, was "drying off," and changed into his shorts and shirt. At some point during the football game, there was a physical altercation by the door between Grasmick and T.G. about how T.G. "wanted to go outside and like get something from the car, and [Grasmick] told [T.G.] to put his shoes on and [T.G.] didn't listen." When T.G. "went to go out, [Grasmick] jumped up and grabbed [T.G.] and said, 'You're not going outside without your shoes on.'" L.B. stated that when Grasmick said that, Grasmick was yelling. Grasmick grabbed T.G. by placing one of his hands on "the back of [T.G.'s] neck, shoulder area" and "just held him there . . . up against the wall." L.B. said that Stacy "went over and pushed [Grasmick] off," and Stacy said, "'Come on, [T.G.], let's go,'" and they left the room.

### (b) Stacy's Testimony

Stacy testified that she had been engaged to Grasmick since October (after the incident), having been "together" for 14 years. Stacy recalled that on October 7, 2017, she was present for the physical part of the altercation, but had spent the majority of that evening in "the swimming pool area, in the front lobby area" with Shannon. T.G. had "come up and gotten changed out into normal street clothes," deciding at that point to go outside. T.G. had "grabbed the [car] keys." T.G. "wouldn't put his shoes on to go outside to get his headphones out of the car, and [Grasmick] grabbed him." Stacy said Grasmick was yelling. Stacy said she was sitting on the bed farthest from the door when that happened. In response, she "jumped off the bed, and [she] ran to the door and got in between [Grasmick] and [T.G.]" and then "got [T.G.] and [she and T.G.] went out into the hallway." At some point, Stacy asked Shannon to call 911. Stacy waited for law enforcement in the parking lot. She spoke to police officers and recalled she had mentioned that she felt that Grasmick was drunk.

Stacy discussed T.G.'s diagnoses of "autism, frontal lobe brain damage, and traumatic brain injury" (the record indicates T.G. already had such diagnoses before the incident of this case). Stacy said that T.G. has "sensory issues." As to whether headphones help T.G. calm down, Stacy answered, "I don't know that headphones do. Electronics calm him down. We're always telling him to turn the volume down, so we got him headphones so he can listen to it."

### (c) Officer Modec's Testimony

Officer Michael Modec testified that he was a police officer for the City of Scottsbluff and had been in law enforcement for about 17 years. He recalled that on October 7, 2017, he was dispatched to the hotel around 9:30 p.m. "for a father choking his 13-year-old son." When he arrived on location, he first had contact with Stacy; at trial, he described Stacy's demeanor at that point as "upset, emotional, kind of frantic." He remembered T.G. appeared to be "somewhat calm" and that there was a "slight redness to the left side of [T.G.'s] neck." Officer Modec went inside the (hotel) to speak with Grasmick. Officer Modec said Grasmick admitted that he had grabbed T.G. on the shoulders, which the officer said was not consistent with "the other stories" he had heard that day. Officer Modec went back outside and asked T.G. if he could see T.G.'s "shoulders and the upper part of his arms," which T.G. allowed. Officer Modec could not see anything (on T.G.'s shoulders and upper part of his arms). Two hours after he was dispatched, Officer Modec could not see any redness previously observed on the left side of T.G.'s neck.

### 2. DEFENSE'S EVIDENCE

### (a) Woodrow's Testimony

Woodrow testified that he had known Grasmick for about 12 or 13 years. Woodrow remembered that on the evening of October 7, 2017, he was at the hotel "watching the Wisconsin-Nebraska game." He said Shannon, his girlfriend, "works at the front desk, so she was there." He indicated that Grasmick, Stacy, and T.G. were former neighbors and they "became the best of friends."

Woodrow acknowledged that he, Grasmick, and L.B., were "pretty much" in the (hotel) room watching the game, but he said T.G. and Stacy "were in and out," "were at the pool," and "basically were at the lobby hanging out with [Shannon]." When the incident occurred, Grasmick was "on his double bed, and then [Woodrow and L.B.] were on the other double bed sitting at the edge." At the time, "[T.G.] had just came back in from being at the pool." T.G. wanted to get his clothes on to go out to the car to get his tablet, which is when "everything took place" and Grasmick stopped T.G. Woodrow said that T.G. "tried to leave," but Grasmick stopped T.G. by "grabb[ing] him by his shoulders" and saying, "'You need to get your damn shirt, son.'" Grasmick grabbed T.G. with "[b]oth hands." Then Stacy entered the door and "[she and Grasmick] were arguing about putting his hands on [T.G.], but she didn't see anything that happened . . . [Grasmick] grabbed [T.G.] to stop him from leaving the door without his shoes and socks." Woodrow never saw Stacy run in between Grasmick and T.G. Woodrow said that after the argument, Stacy took T.G. out of the room and she and T.G. went to the lobby.

### (b) Grasmick's Testimony

Grasmick testified about the incident, agreeing that he was "pretty much" in the room the entire evening watching the football game and that T.G. did not spend much time in the room but "was in and out a lot." He indicated he ate food during the football game and had "four, maybe five" beers that evening. He testified that T.G. wanted to go outside to get his headphones out of the car, and that he (Grasmick) told T.G. he had to get on a shirt and shoes. T.G. "didn't want to get his shoes on. He just wanted to go get his headphones and come right back in." Grasmick said

that T.G. "grabbed [Grasmick's car] keys" and Grasmick "jumped up and caught [T.G.] at the door." Grasmick said he "put [his] hands on [T.G.'s] shoulders, and [Grasmick] told him, 'Look, you've got to get your shoes on, and you've got to have a shirt on before you go outside.'" By then, Stacy had "forcefully jammed in between [Grasmick] and [T.G.]," and Grasmick then "backed off." Stacy had come back in the room "maybe five minutes before [the incident] happened." Stacy and T.G. walked out the door. Grasmick explained his actions as wanting "to make sure [T.G.] was going to be safe to go outside with proper clothing." Grasmick denied grabbing T.G. by the neck and holding T.G. by the neck up against the wall, but Grasmick said T.G. was "up against the wall when [he] had [T.G.] by the shoulders."

### 3. JURY VERDICTS AND SENTENCING

After the defense rested, Grasmick renewed his motion for directed verdict on the count of third degree domestic assault (previously overruled following the State's presentation of evidence), which the district court again overruled. Closing arguments followed and the case was submitted to the jury. Later the same day, the jury found Grasmick guilty of intentional child abuse (as to T.G.) and not guilty of third degree domestic assault (as to Stacy). At the sentencing hearing on March 5, 2018, the district court sentenced Grasmick to 18 months' probation on the intentional child abuse conviction. Grasmick appeals.

### III. ASSIGNMENT OF ERROR

Grasmick claims the evidence presented by the State at trial was insufficient to support his conviction.

### IV. STANDARD OF REVIEW

In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Wells*, 300 Neb. 296, 912 N.W.2d 896 (2018).

### V. ANALYSIS

Grasmick was convicted of intentional child abuse under § 28-707(4), which provides that child abuse is a Class IIIA felony if it is committed knowingly and intentionally and does not result in serious bodily injury or death.

The jury instruction for the child abuse charge allowed the jury to find Grasmick guilty of intentional child abuse if it found that Grasmick had knowingly or intentionally caused or permitted T.G., a minor child, to be: (a) placed in a situation that endangered the child's life or physical or mental health; (b) cruelly confined or cruelly punished; or (c) deprived of necessary food, clothing, shelter, or care. Such instruction reflects alternative theories of child abuse, which correspond, respectively, to subsections (a), (b), and (c) of Neb. Rev. Stat. § 28-707(1). The judgment will be affirmed if it was sufficient to support any of the State's alternative theories of guilt. See *State v. Knutson*, 288 Neb. 823, 852 N.W.2d 307 (2014).

- 4 -

On appeal, Grasmick argues against the State's submitted theories of cruel confinement or punishment of T.G. or endangerment of T.G.'s life or health. For reasons discussed below, we disagree with Grasmick's argument that "at no time was [T.G.] ever placed in any situation that endangered his life, physical or mental health." Brief for appellant at 9. Further, while he contends that he was "trying to prevent harm to [T.G.] by his actions that night," *id.* at 11, because T.G. was alone, may have encountered someone in the parking lot, and may not have returned, the jury was also able to consider evidence that Grasmick's reasoning for stopping T.G. from going outside was because T.G. had not put his shoes on yet.

According to Stacy, at the time of the incident, T.G. was around 4 feet 10 inches tall and weighed 100 pounds, and that (at the time of trial) Grasmick was 5 feet 11 inches tall and weighed "maybe 200 pounds or more." Stacy testified that T.G. was not a very large child for his age. Both Stacy and Grasmick discussed one of T.G.'s medications that T.G. took once a day in the mornings for his autism and frontal lobe injury diagnoses. Stacy said the frontal lobe brain damage "took away the thinking process . . . [that medication] slows [T.G.] down to where he can actually think about what he does before he does it." Grasmick said that for 4 or 5 years, T.G. had been on that medication, which was "necessary" for T.G., otherwise "[T.G.] acts out . . . and it's really hard to control him. He gets to a point where he wants to hurt himself." Stacy said it was "[v]ery important" that T.G. take his medications daily (he took other medications for allergies and acid reflux), "or he's out of control, he don't [sic] listen, very hyper." However, according to Stacy and Grasmick, T.G. had not taken any medication on the morning of the incident; nobody packed the medication described as "necessary."

There was evidence presented at trial about T.G.'s behavior prior to the incident. L.B. stated that T.G. had been in the room and would "grab[] stuff or just sit on the bed with us and play around." Woodrow said that T.G. had been "on the bed jumping around, and we were trying to tell [T.G.] to stop it. He was aggravating me and [L.B.] . . . all through the game." He called T.G.'s behavior that of a "rambunctious kid."

The evidence revealed that Grasmick had physically confronted T.G. after T.G. refused to follow Grasmick's demands. Viewing the evidence in a light most favorable to the State, as this court must, the evidence established that T.G. had come back from the swimming pool to the hotel room, had changed into his shorts and shirt, and wanted to go get something (a tablet or headphones) out of the car. When T.G. tried to exit the room, Grasmick jumped up, grabbed T.G., and yelled something to the effect of T.G. not being allowed to go outside until T.G. put on his shoes. L.B. testified that Grasmick had grabbed T.G. by placing one of his hands on "the back of [T.G.'s] neck, shoulder area" and "just held him there . . . up against the wall." Stacy indicated that in response to the confrontation, she jumped off the bed where she was sitting and ran to get in between Grasmick and T.G., "got [T.G.] and [she and T.G.] went out into the hallway." Grasmick acknowledged that Stacy "forcefully jammed" herself between Grasmick and T.G., at which point he then "backed off." At some point Stacy asked Shannon to call 911. L.B. remembered telling a police officer that Grasmick "flipped out and charged after [T.G.]." And when Officer Modec first observed T.G., there was a "slight redness to the left side of [T.G.'s] neck."

We note the nature of Grasmick's physical confrontation upon (the much smaller) T.G. could be reasonably interpreted by the jury as an unreasonable response to T.G.'s refusal to put his

shoes on, keeping in mind the circumstances of Grasmick's apparent awareness of T.G.'s diagnoses (including autism and frontal lobe brain damage) and T.G.'s absence of "necessary" medication that day which could have explained T.G.'s uncooperativeness. Though Grasmick argues he did not physically injure T.G., testimony that Grasmick grabbed T.G. at the back of T.G.'s neck (and/or shoulder area) and held T.G. up against a wall and that T.G. later had a slight redness to the left side of his neck suggests otherwise. Regardless, an actual injury is not required to support a conviction under § 28-707(1)(a). See *State v. Mendez-Osorio*, 297 Neb. 520, 521, 900 N.W.2d 776, 779-80 (2017) (under § 28-707(1)(a), "'endangers' means to expose a minor child's life or health to danger or the peril of probable harm or loss . . . it is the likelihood of injury against which § 28-707(1)(a) speaks"; § 28-707(1)(a) covers both direct and indirect consequences of a defendant's conduct). We believe it is within the general knowledge of triers of fact that Grasmick's conduct placed at risk T.G.'s health, already compromised by his diagnosed conditions. See *State v. Knutson, supra* (triers of fact may apply to the subject before them that general knowledge which any person must be presumed to have).

Accordingly, we find that a rational trier of fact could have found that the evidence established beyond a reasonable doubt that Grasmick's conduct had a direct consequence of placing T.G. in a situation which endangered T.G.'s physical or mental health in violation of § 28-707(1)(a). See, *id.*; *State v. Mendez-Osorio, supra*; *State v. Knutson, supra*. Finding sufficient evidence for a violation of § 28-707(1)(a), we need not consider whether evidence was sufficient to support the State's alternative theories of guilt. See *State v. Knutson, supra*.

As a matter of completeness, while not specifically disputed in Grasmick's appellate brief, this court finds sufficient evidence supports that Grasmick acted intentionally in endangering T.G. in light of the circumstances of the altercation, stated above, including repetitive testimony from various witnesses and Grasmick himself that Grasmick grabbed T.G. (testimony merely conflicted as to whether he grabbed T.G. by the neck or shoulders). See *State v. Blair*, 272 Neb. 951, 726 N.W.2d 185 (2007) (intent with which act is committed may be inferred from words and acts of defendant and from circumstances surrounding incident).

## VI. CONCLUSION

We conclude there was sufficient evidence to support the jury's verdict, and therefore, we affirm Grasmick's conviction.

AFFIRMED.