IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. KLEIN

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

JESSE R. KLEIN, APPELLANT.

Filed October 8, 2019.    No. A-18-1132.

Appeal from the District Court for Lancaster County: SUSAN I. STRONG, Judge. Affirmed.

Timothy S. Noerrlinger for appellant.

Douglas J. Peterson, Attorney General, and Matthew Lewis for appellee.

RIEDMANN, BISHOP, and ARTERBURN, Judges.

BISHOP, Judge.

## INTRODUCTION

After a jury trial, Jesse R. Klein was convicted of one count of third degree domestic assault and one count of negligent child abuse. The Lancaster County District Court sentenced Klein to concurrent terms of 24 months' probation for each conviction and 30 days' jail (house arrest). On appeal, Klein claims his convictions are not supported by sufficient evidence. We affirm.

## BACKGROUND

In February 2018, the State filed an information, charging Klein with one count each of strangulation (alleged victim J.E.), third degree domestic assault (alleged victim J.E.), and negligent child abuse (alleged victim C.K.). The State asserted the crimes happened on or about August 27, 2017; trial took place in September 2018.

- 1 -

The State's case consisted of testimony from two police officers and J.E., as well as photographs of J.E.'s alleged injuries from the incident, Klein's signed "Miranda Warning and Waiver," and a redacted video of Klein's jail interview regarding the incident.

J.E. testified that she and Klein began dating in March 2015, then became engaged 1 month later. They called off the engagement in January 2016, but continued to live together. J.E. and Klein were dating again when their daughter, C.K., was born in March 2017. J.E. and Klein argued "more than time to time" and had difficulties over the course of their relationship.

On August 27, 2017, J.E. was living with Klein at a residence on Venice Lane in Lincoln, Nebraska. At that time, Klein owned a business and worked Monday through Saturday and "would even work on Sundays"; J.E. was a stay-at-home mother. According to J.E., around 6 or 7 p.m., she and Klein were in the living room and began to verbally argue because J.E. was "upset" Klein was not spending time with her and C.K. Klein "[t]ried to ignore it" but then argued that all J.E. ever wanted was "his time." Both Klein and J.E. became irritated. The argument escalated to "yelling." J.E. was holding C.K. At some point, both Klein and J.E. stood up. Klein "had the last word" and "whatever he said" J.E. knew she did not need to say anything else or it "was going to get a lot worse." J.E. "stood silently." Klein "had raised his hand" and J.E. took that to mean she was going to "get hit," but Klein "put his arm down" and walked away.

But then J.E. heard Klein turn around. J.E. recounted that Klein "put his hands around [her] neck, from behind, to the side, kind of, so, like [a] 90 degree angle . . . or [a] 45 degree angle. And [she] just stayed as quiet as [she] could." J.E. was still holding C.K. As Klein put both of his hands around her neck, J.E. immediately "could feel that [she] couldn't breathe." She was "terrified" she was never going to look at C.K. again. J.E. could feel Klein applying pressure to her neck and she started to see "spots." J.E. felt a stinging sensation in her neck right after Klein released his grip; she felt pain in her neck "after" the incident. "It stung. He had, I guess, dug his [finger]nails into me"; Klein had "torn the flesh" (on her neck). Klein had his hands around J.E.'s neck for at least "a minute, [or] two" before he let go.

J.E. said she stayed as "perfectly still" as she could during the altercation but was holding C.K. and "bouncing up and down," which is what she "always did when [C.K.] was fussy." C.K. had started to cry and panic during the physical part of the incident. J.E. "couldn't do anything." As soon as Klein released his grip on J.E.'s neck, Klein tried to take C.K. from J.E., but J.E. tried to "hold on." C.K. was crying. Klein "went to go pull [C.K.] again" and J.E. thought "he's going to hurt her, I just need to give [C.K.] to him, [be]cause otherwise pulling on an infant is not a good thing." After Klein "forcibly" took C.K., C.K. "let it all out" and screamed. Klein took C.K. to the garage. J.E. went upstairs after "catching" her breath and took photographs of her neck while standing in C.K.'s bedroom. J.E. said she could still hear C.K. crying while she was taking those photographs (exhibits 1 and 8).

After taking the photographs of herself, J.E. "paced" because she did not know what to do. She went into the room she shared with Klein. Eventually, J.E. heard Klein walking up the stairs. C.K. was still "screaming." Klein came in the room where J.E. was but would not hand C.K. over to J.E., instead placing C.K. where she normally had slept. J.E. waited for Klein to leave so that she could pick up C.K. When J.E. heard the garage door open, she picked C.K. up and was able to get C.K. to calm down. Klein drove away.

After the incident, J.E. figured things would return to "normal," but the relationship continued to deteriorate to the point where Klein ended the relationship. J.E. estimated that she officially moved out of the Venice Lane residence around October 6, 2017. J.E. said she reported the incident to law enforcement on October 10, admitting Klein had threatened her that day that he was going to take C.K. and that J.E. would never see C.K. again. J.E. said she filed a protection order on an officer's advice, and sought temporary custody of C.K.

Officer Mary Lingelbach, a police officer with the City of Lincoln, testified that she was working on patrol on October 10, 2017. She was dispatched to an address to "take a belated domestic report, where the party responsible was not on location." Officer Lingelbach met J.E. upon arriving there. J.E. initially wanted to ask Officer Lingelbach about the safety of J.E. and J.E.'s daughter (C.K.). Officer Lingelbach received information that a crime may have occurred and decided to investigate by interviewing J.E. about what happened in August between J.E. and Klein.

Officer Lingelbach said J.E. showed "selfies with her [(J.E.'s)] cell phone" (photographs J.E. took of herself) of injuries on J.E.'s neck "almost immediately after [the incident] had occurred." Officer Lingelbach asked that J.E. email the photographs to her; those photographs are exhibits 1 and 8. Exhibit 1 shows a larger red open-wound surrounded by redness near the center of J.E.'s throat, and several other red marks on the left side of J.E.'s neck. Exhibit 8, taken from a different angle, shows part of the larger open-wound at the center of J.E.'s throat, and a red mark on the right side of J.E.'s neck. Both photographs appear to have been taken in the same room. Officer Lingelbach believed J.E. sustained a "fingernail gouge on the front of her neck, on her throat," saying she knew how to identify the injury as such based on "the story" told by J.E. about what had happened.

Officer Lingelbach directed J.E. to "pull" those two photographs (exhibits 1 and 8) up on J.E.'s cell phone to allow for documentation of the date, time, and location associated with those photographs. The record reflects this could be accomplished by opening a menu of options while the selected photograph was displayed on the cell phone screen, then choosing the option titled "Details" which would show time, date, and location information for the photograph. Exhibits 2 through 4 correspond with exhibit 1; they show that the photograph in exhibit 1 was taken on August 27, 2017, at 7:07 p.m. at the address on Venice Lane. Exhibits 5 through 7 relate to exhibit 8; they show that the photograph in exhibit 8 was taken the same day and time at an address south of 90th Street (J.E. indicated photographs showed an approximate location for where she was at the time because she and Klein had lived at a residence on a "corner").

Officer Lingelbach identified exhibit 9 as another photograph J.E. emailed to her because J.E. "wanted to show that she still had the injury, but they were beginning to heal." Exhibit 9 shows J.E. sitting in a vehicle and a larger scab on the center of her throat surrounded by slight redness. Exhibits 10 through 12 correspond to exhibit 9, showing that the photograph (exhibit 9) was taken August 30, 2017. As for what Officer Lingelbach observed the day she first interviewed J.E. (October 10), she said J.E. still had "kind of a little scar and mark" in the same location as the officer saw injuries in J.E.'s photographs from August. Officer Lingelbach took two photographs of J.E., one from further away to include J.E.'s face (exhibit 13) and a "close-up" of J.E.'s neck (exhibit 14). Exhibit 14 suggests the scab at the center of J.E.'s throat further healed and became a less defined red mark than it had appeared previously.

- 3 -

Officer Lingelbach returned to J.E. the next day to have J.E. make a recorded statement, fill out forms, and assist in the investigation. J.E. was "a little frightened" to be recorded but eventually "felt a little more relieved" about what was going to happen. Officer Lingelbach informed J.E. about the option of obtaining a protection order. That same day, Officer Lingelbach requested another officer attempt to locate Klein.

Officer Andrew Nichols, a police officer with the Lincoln Police Department, testified that he was working on patrol on October 11, 2017, when he was directed to attempt to locate, arrest, and interview Klein. Officer Nichols found Klein at the residence on Venice Lane, arrested him, and transported him to the jail where Officer Nichols proceeded to interview Klein. The record reflects that Klein was read his "Miranda rights" and waived them. Officer Nichols said exhibit 16 is "the disk that has the interview [of Klein] on it," with some redactions for purposes of complying with evidentiary rules. Exhibit 16 was played for the jury.

During Klein's interview, he identified C.K. as his daughter. He stated he "got tired" of J.E.'s "nagging" so he asked her to "leave" in October 2017. At first, Klein thought he was in Iowa around Labor Day but he then remembered that was incorrect. Throughout the interview, Officer Nichols confronted Klein with parts of what seems to be a police report about J.E.'s allegations regarding the incident of August 27, 2017. Officer Nichols told Klein that J.E. took photographs showing the progression of the appearance of injuries to J.E.'s neck over time and that there was still a scar from the incident. Klein claimed J.E. had a scar on the left side of her neck for a long time from what she had told him was a cat (during trial, J.E. denied she had any marks or scars on her neck before the altercation at issue).

Officer Nichols asked why J.E. said the incident happened as she alleged it had. Klein thought the argument happened in "the bedroom" so C.K. was on the bed or in her "playpen thing." Klein said: "I could see us having a fight. I could see me using my hands to move myself but how [J.E.] put it is complete bullshit." He would have reported it as "mov[ing]" J.E., but he did not grab J.E. around the neck. He indicated where J.E. was in reference to him by positioning his hands close to his face. He said J.E. had a tendency to wave her arms; "I'm sure there may have been a mark left some way or another. But I'm not doing it to hurt her, I'm doing it to move so I can go somewhere else." As far as he could remember, Klein would grab J.E. by the arms or wrists to move J.E. in the past. He denied that he grabbed J.E. from behind by the throat or that he strangled J.E.

After the State rested, the defense moved for a directed verdict on all counts. The district court overruled that motion. Thereafter, Klein waived his right to testify, and the defense rested. The jury found Klein was not guilty on the count of strangulation. However, the jury found Klein was guilty on the count of third degree domestic assault and the count of negligent child abuse. The district court accepted the jury's verdicts.

On November 6, 2018, the district court sentenced Klein to 24 months of probation for his conviction of third degree domestic assault and 24 months of probation for his conviction of negligent child abuse, which sentences were ordered to run concurrently to each other but consecutively to any other sentence being served by Klein. Klein was also sentenced to 30 days in jail, with 1 day of credit for time previously served (execution of this sentence deferred to begin

November 16). On November 7, the district court entered an order granting Klein's request to serve his jail sentence on house arrest.

Klein appeals.

## ASSIGNMENT OF ERROR

Klein contends there was insufficient evidence to support his convictions.

## STANDARD OF REVIEW

In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Mrza*, 302 Neb. 931, 926 N.W.2d 79 (2019).

## ANALYSIS

### THIRD DEGREE DOMESTIC ASSAULT

Klein was convicted of domestic assault in the third degree under Neb. Rev. Stat. § 28-323(1) (Reissue 2016). As pertinent here, a person commits third degree domestic assault if he or she intentionally and knowingly causes bodily injury to his or her intimate partner, which includes "persons who have a child in common whether or not they have been married or lived together at any time" or "persons who are or were involved in a dating relationship." See, § 28-323(1)(a); § 28-323(8). It is not disputed that J.E. was Klein's intimate partner. "Bodily injury" means "physical pain, illness, or any impairment of physical condition." Neb. Rev. Stat. § 28-109(4) (Reissue 2016).

The jury was instructed that it could find Klein guilty of third degree domestic assault if the State proved beyond a reasonable doubt that he knowingly and intentionally caused bodily injury to his intimate partner (J.E.) or intentionally threatened his intimate partner (J.E.) with imminent bodily injury. The instruction reflects alternative theories of third degree domestic abuse which correspond, respectively, to subsections (a) and (b) of § 28-323(1). Because we determine below that sufficient evidence supports Klein's conviction of third degree domestic assault under § 28-323(1)(a), we need not consider the lesser alternate theory presented to the jury under § 28-323(1)(b). See *State v. Goynes*, 303 Neb. 129, 927 N.W.2d 346 (2019) (appellate court not obligated to engage in analysis that is not necessary to adjudicate the case and controversy before it).

On appeal, Klein points out that the jury found him not guilty as to the count of strangulation. He claims that, therefore, the jury found he "did not choke [J.E.]" but "only touched" her on her neck according to her testimony. Brief for appellant at 7. Klein's assertion narrowly construes § 28-323(1)(a) and conflates its elements with those of the separate offense of strangulation. See Neb. Rev. Stat. § 28-310.01(1) (Reissue 2016) (person commits strangulation if person knowingly or intentionally impedes normal breathing or circulation of blood of another person by applying pressure on throat or neck of other person). A defendant could certainly be

convicted under § 28-323(1)(a) for physical contact to a victim other than choking the victim, as long as the physical contact causes bodily injury. See § 28-310.01. See, also, § 28-109(4).

Klein takes issue with J.E.'s testimony that Klein "put his hands around [J.E.'s] neck, from behind, to the side, kind of, so, like [a] 90 degree angle . . . or [a] 45 degree angle." During cross-examination, J.E. indicated Klein was standing to the right side of her. Klein argues "[t]his location does not match with the injuries denoted in the exhibits." Brief for appellant at 7. Klein did not offer testimony of a witness, expert or otherwise, or other evidence to establish that argument. However, Officer Lingelbach opined J.E.'s injuries in the photographs were consistent with J.E.'s report of the incident. We note that the photographs from the evening of the incident (exhibits 1 and 8) reflect that most red marks were on the left side of her neck, plus there was the single larger open-wound on the center of her throat. A rational fact finder applying general knowledge to the evidence could reason that the placement of those injuries was compatible with Klein having caused them using his hands while positioned standing behind and to the right side of J.E. at an angle.

After the incident, J.E.'s neck painfully "stung." Further, she had sustained visible markings to her neck. Clearly, J.E. suffered bodily injuries as defined by § 28-109(4). Her detailed account of Klein's physical attack on her and the verbal argument between them leading up to it was corroborated most notably by the photographs she took right after the August 2017 incident showing her fresh injuries (exhibits 1 and 8), but also by the photograph she took a few days later (exhibit 9), and Officer Lingelbach's trial testimony and photographs taken in October (exhibits 13 and 14).

Although the prosecution did not have to prove Klein admitted committing the charged crime, Klein argues the "evidence would not support a finding that [he] admitted to causing bodily injury to [J.E.]." Brief for appellant at 7. Still, the jury could have reasonably deduced otherwise from what Klein said during his interview with Officer Nichols. Klein denied grabbing J.E. by the neck, but admitted that he physically "moved" J.E. and was "sure" that "there may have been a mark left some way or another." In other words, Klein acknowledged that he initiated bodily contact to J.E.'s person during the August 2017 altercation and believed a "mark" was left on J.E. because of that contact.

As the State argues, whether Klein meant to hurt J.E. in the process of causing injury to her neck is irrelevant; § 28-323(1)(a) requires only that Klein intentionally and knowingly caused bodily injury to J.E. The intent with which an act is committed may be inferred from the words and acts of the defendant and from circumstances surrounding the incident. See *State v. Blair*, 272 Neb. 951, 726 N.W.2d 185 (2007). According to J.E., near the end of the verbal argument, Klein raised his hand as if in preparation to hit J.E. but did not follow through and instead walked away. Klein then purposely came back. The jury could reasonably conclude that Klein returned to J.E. with the intent to purposely inflict bodily injuries upon her, especially given the increasingly contentious argument that J.E. and Klein each indicated became physical at some point.

Viewing the evidence in a light most favorable to the prosecution, there is sufficient evidence to establish beyond a reasonable doubt that Klein knowingly and intentionally used his hands to cause bodily injury (or bodily injuries) to J.E.'s neck. Klein's conviction of third degree domestic assault is supported by sufficient evidence.

Klein was convicted of negligent child abuse under Neb. Rev. Stat. § 28-707(1)(a) (Reissue 2016) and § 28-707(3). As relevant here, § 28-707(1)(a) provides that a person commits child abuse if he or she negligently causes or permits a minor child to be placed in a situation that endangers his or her life or physical or mental health. Although alternate theories of child abuse exist under § 28-707(1), the jury in the instant case was instructed that it could find Klein guilty of the count of child abuse only if evidence showed beyond a reasonable doubt that "Klein did negligently cause or permit [C.K.] to be placed in a situation that endangered her life or physical or mental health." Our analysis is, thus, limited accordingly. See *State v. Goynes, supra* (appellate court not obligated to engage in analysis that is not necessary to adjudicate the case and controversy before it).

Klein does not dispute that C.K. was a minor child at the time of the incident. He contends that he and J.E. were engaged in an argument and there was "nothing" he "said or did that was above and beyond [J.E.'s] behavior that would justify a finding that she did not also abuse [C.K.]." Brief for appellant at 8. This deflective argument is irrelevant to whether sufficient evidence supports Klein's conviction of negligent child abuse. Klein further claims that there is insufficient evidence to support a finding that "anything he said or did that evening . . . placed [C.K.] in a situation dangerous to her life or mental health." *Id.*

"Endangers" for purposes of § 28-707(1)(a) means to expose a minor child's life or health to danger or the peril of probable harm or loss. *State v. Ferguson*, 301 Neb. 697, 719, 919 N.W.2d 863, 881 (2018). The purpose of criminalizing conduct under the statute is that where a child is endangered, he or she may be injured; it is the likelihood of injury against which the statute speaks. See *State v. Ferguson, supra*. Criminal endangerment in § 28-707(1)(a) encompasses not only conduct directed at the child but also conduct which presents the likelihood of injury due to the child's having been placed in a situation caused by the defendant's conduct. *Id.* That is, § 28-707(1)(a) covers both direct and indirect consequences of a defendant's conduct which place a child in a situation that endangers his (or her) life or physical or mental health. See *State v. Mendez-Osorio*, 297 Neb. 520, 900 N.W.2d 776 (2017).

In *State v. Mendez-Osorio, supra*, the Nebraska Supreme Court affirmed a defendant's negligent child abuse conviction under § 28-707(1)(a) as supported by sufficient evidence. The Court noted that the record showed the defendant was aware that his children were present in the home when he threatened the children's mother with a machete. As a result, the mother was afraid for her safety and for the safety and well-being of her children; she picked up two of the children and fled to a neighbor's home to seek help (she did not have time to bring the third, oldest child). A police officer who responded to the incident testified that he saw the children crying and the neighbor testified that at least one of the children was afraid. Recognizing that a conviction under § 28-707(1)(a) does not require a direct threat by the defendant upon the children, the Nebraska Supreme Court concluded that the defendant's conduct caused the mother to flee the home with the youngest children, who became upset and were made fearful by the incident. The defendant's conduct, "even if characterized as indirect, caused the children to be placed in a situation which endangered their well-being." *State v. Mendez-Osorio*, 297 Neb. at 537, 900 N.W.2d at 788.

In this case, J.E. testified that she was holding C.K. during the whole argument with Klein, including the part of the argument when Klein physically assaulted J.E. We do not repeat all the specifics of J.E.'s account of the altercation here, but we highlight the following. C.K. started to cry and panic around the time Klein physically caused the visible bodily injuries to J.E.'s neck. C.K. continued to cry as Klein attempted to take C.K. while J.E. initially resisted those attempts. C.K. "screamed" to a greater extent once Klein "forcibly" took C.K. from J.E. C.K. did not stop "screaming" until J.E. was able to pick her up after Klein left the residence.

Klein's physical assault was clearly targeted at J.E., not C.K. However, the record supports that Klein's conduct in carrying out that offense exposed C.K. to a likelihood of actual injury, particularly when Klein forcibly pulled C.K. away from J.E. A rational fact finder could have concluded as much. Alternatively, a reasonable jury could have found that C.K. was endangered due to C.K. becoming visibly emotionally upset after being in proximity to the physical assault to her mother, along with an increased level of emotional distress when she was subsequently forcibly pulled away from her mother.

In the context of § 28-707, "negligently refers to criminal negligence and means that a person knew or should have known of the danger involved and acted recklessly, as defined in [§] 28-109, with respect to the safety or health of the minor child." § 28-707(9). "Recklessly" means:

[A]cting with respect to a material element of an offense when any person disregards a substantial and unjustifiable risk that the material element exists or will result from his or her conduct. The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to the actor, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.

§ 28-109(20). The record, viewed favorably to the State, supports that Klein was aware that J.E. was holding C.K. during the entire argument. Klein should have known the danger he posed to C.K. in deciding to physically assault J.E. while J.E. was holding C.K. Klein acted recklessly toward C.K.'s safety and health in proceeding to assault J.E., and subsequently forcibly pulling C.K. away from J.E.'s possession. See *State v. Blair*, 272 Neb. 951, 726 N.W.2d 185 (2007) (intent with which act is committed may be inferred from words and acts of defendant and from circumstances surrounding incident).

Viewing the evidence in the light most favorable to the prosecution, we conclude that a rational trier of fact could conclude that the evidence established beyond a reasonable doubt that Klein was guilty of negligent child abuse in violation of § 28-707(1)(a).

## CONCLUSION

For the foregoing reasons, we affirm both of Klein's convictions.

AFFIRMED.