IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. WATKINS

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

RAMON R. WATKINS, APPELLANT.

Filed September 1, 2020.    No. A-19-1040.

Appeal from the District Court for Douglas County: TIMOTHY P. BURNS, Judge. Affirmed.

Beau Finley, of Law Offices of Beau Finley, P.C., L.L.O., for appellant.

Douglas J. Peterson, Attorney General, and Siobhan E. Duffy for appellee.

MOORE, Chief Judge, and BISHOP and WELCH, Judges.

BISHOP, Judge.

## I. INTRODUCTION

After a jury trial, Ramon R. Watkins was convicted of one count of child abuse resulting in serious bodily injury. The Douglas County District Court sentenced Watkins to 20 to 25 years' imprisonment. On appeal, Watkins claims errors related to the admission of a certain segment of a police interview video, the insufficiency of the evidence, and the excessiveness of his sentence. We affirm.

## II. BACKGROUND

### 1. PRETRIAL PROCEEDINGS

In March 2018, the State charged Watkins with two counts of child abuse resulting in serious bodily injury. The State asserted that both charged offenses happened on or about February 23. The alleged victims were two of Watkins' minor children, R.W. (then 16 months old) and A.W.

- 1 -

(then 4 months old). On July 29, 2019, the State filed an amended information, still charging Watkins with two counts of child abuse resulting in serious bodily injury to R.W. (count 1) and A.W. (count 2). However, the State asserted that Watkins committed count 1 on or about February 22 through 23, 2018, and count 2 on or about February 9 through 23.

## 2. TRIAL

A jury trial commenced on July 29, 2019. The State's case in chief consisted of testimony from several witnesses and a number of exhibits which were received into evidence. After the State rested, Watkins' counsel moved to dismiss counts 1 and 2. That motion was overruled. The defense rested without putting on evidence. Watkins' counsel submitted a renewed motion to dismiss, which was denied. A summary of the evidence adduced at trial follows.

### (a) Family Structure and Routine

Christeena Cannon testified that she and Watkins are the parents of R.W. (born in October 2016) and A.W. (born in October 2017). Cannon also had a 5-year-old child from a different relationship. Cannon began dating Watkins in May 2015, and later that year, they became engaged. From February 2017 through February 2018, Cannon and Watkins lived together in an apartment in Omaha, Nebraska, with the three children. In February 2018, Cannon worked in a store from 2 p.m. to 10 p.m. or 10:30 p.m. on every weekday except Wednesdays, and from 10 a.m. to 6 p.m. on the weekends. Watkins was not employed during that month. For the most part, Cardella Johnson, a licensed childcare provider who ran a daycare out of her home, watched R.W., A.W., and Cannon's other child when Cannon was working on weekdays. Cannon's niece had referred Cannon to Johnson. R.W. and A.W. began daycare with Johnson when they were each 6 weeks old. Regarding February 2018, Cannon said that Watkins would play video games and drink while she was working and the children were at daycare. Watkins would watch the children when Cannon was at work on the weekends.

### (b) Events on February 22, 2018

On February 22, 2018, Cannon left for work around 1:15 p.m. Sometime that afternoon, Johnson picked up R.W. and A.W. from Cannon's and Watkins' apartment to transport them to her home for daycare. Cannon's other child was at her mother's house that day. Johnson testified that on the day before she called the police, which the record showed referred to February 22, she did not notice any bruising on R.W. or anything abnormal about his behavior. Johnson dropped off R.W. and A.W. at Cannon's and Watkins' apartment at about 7 p.m. or around 8-8:30 p.m. Johnson remembered that when she dropped off the children, she would honk the horn and Watkins would come outside. Johnson indicated that Watkins was "under the influence" on February 22 for dropoff. She recalled being able to make that determination because "[y]ou could smell it" and Watkins was stumbling.

Cannon said she got off work at about 10:30 p.m. on February 22, 2018, and did not make it home until almost 11 p.m. Normally, she would try to enter the apartment through the patio door and Watkins would be sitting in the living room on the other side of that door playing a video game. That evening, Cannon saw through the patio door that Watkins was sleeping on the couch

with a bottle of vodka. She "banged" on the door but he did not wake up. Thirty minutes later, she knocked on her oldest child's window to wake him up and had him let her inside. Cannon put that child back to bed. Without turning on the lights of his room, Cannon checked on R.W. and saw he was asleep in bed. She saw A.W. was asleep in her and Watkins' bedroom.

### (c) Events on February 23 Through February 24, 2018

On February 23, 2018, Cannon's oldest child was picked up from the apartment at 5 a.m. or 6 a.m. by Cannon's mother to go to school. R.W. and A.W. woke up around 7 a.m. or 8 a.m. and Watkins fed them. Cannon dressed A.W.; Watkins dressed R.W. in a shirt with long sleeves and pants. Cannon denied that she saw R.W. shirtless or without clothing that day. Johnson said that she picked up A.W. and R.W. at about noon. According to Cannon, after Johnson picked up R.W. and A.W., Cannon and Watkins went shopping for a vehicle.

Johnson noticed that R.W. was not eating as usual or playing that day. Around 5 p.m., Johnson was about to change R.W.'s diaper when she saw a mark on his stomach. Johnson checked the rest of R.W.'s body and saw he had "marks everywhere." In response, Johnson believed she first called Cannon's niece and sent her photographs of R.W.'s injuries; those photographs were admitted into evidence. Johnson then called Cannon to let her know that she had seen "marks" and that she was going to keep R.W. for the weekend but was bringing A.W. home. Johnson said she was bringing A.W. home because A.W. would cry the "whole time" and Johnson had not seen any physical marks on her. Johnson said that R.W. started vomiting when he was in her vehicle at about 6 p.m. and would not stop.

Cannon recalled that she did not think anything of Johnson's request to keep R.W. on the evening of February 23, 2018. Watkins did not object to Johnson's request either. Johnson dropped off A.W. that evening and then A.W. went to Watkins' cousin's house while Cannon, Watkins, and two of Watkins' other cousins went out to eat around 6 p.m. or 7 p.m. Sometime between 7 p.m. and 8 p.m., Cannon saw that her niece had sent her text messages containing the photographs of R.W. which Johnson had taken; that is when Cannon became aware that R.W. had bodily injuries. Cannon showed the photographs to Watkins. Cannon wanted to know what was wrong with R.W. She contacted Johnson via her and Watkins' cell phones. Cannon and Watkins learned from Johnson that Child Protective Services (CPS) and law enforcement were going to be involved. At some point, Cannon or Watkins asked for Johnson's address; Cannon indicated that they did not know Johnson's exact address at the time as Johnson had moved residential locations. Johnson did not provide her address to them out of safety concerns for R.W.

Officer Marcos Diaz of the Omaha Police Department (OPD) was on patrol with Officer Dion Smith on February 23, 2018, when he received a radio call at about 9 p.m. to check the well-being of a child at Johnson's home. The officers responded to the call. Officer Diaz spoke with Johnson, the "reporting party," inside her home. Officer Diaz saw that R.W. had bruises all over his body. Officer Diaz advised certain OPD detectives of the situation and then he and Officer Smith transported R.W. to a hospital's emergency department.

Dr. Heather Books, a pediatric emergency medicine physician, began to treat R.W. at about 11 p.m. in the hospital's emergency room on February 23, 2018. After Dr. Books assessed R.W.'s "extensive" bruises, lab tests and x rays were performed on R.W.; he had bruises and markings

over several parts of his body, a rib fracture of a rib located on his back right-hand side that was already in the process of healing, and a more-recent pancreatic laceration and likely coinciding liver damage. At some point, A.W. was also transported to the hospital's emergency department on February 23. Dr. Books took over care of A.W. at 2 a.m. on February 24. A.W. was discovered to have suffered two skull fractures, a subdural hematoma, three or four rib fractures, and broken or otherwise injured femurs and tibias. Ultimately, R.W. and A.W. were admitted to the hospital for further consultation and treatment. Dr. Suzanne Haney, a child abuse pediatrician, examined R.W. and A.W. at the hospital on the morning of February 24. Dr. Haney concluded that R.W.'s and A.W.'s injuries were the result of abuse.

Cannon said she had called law enforcement at about 9:15 p.m. on February 23, 2018, to report a "kidnapping" since Johnson would not provide her address. At the time, Cannon did not know the source of R.W.'s injuries. OPD Officer Grant Gentile was on patrol that evening when he received a call from CPS around 9:32 p.m. He and Officer Mark Blice responded to Cannon's and Watkins' apartment. Officer Gentile came to learn that there was another call to that apartment earlier that evening about a potentially missing child. At the apartment, Officer Gentile made contact with Cannon and Watkins. The officers stated that they needed to check on the children. Cannon was willing to let the officers enter the apartment but Watkins objected. Watkins told Cannon to stop talking to the officers. The record indicates that the officers ended up taking both Watkins and Cannon to the police station.

OPD Detective Stephan Skaar was assigned to the investigation regarding R.W. and A.W. at about 10 p.m. on February 23, 2018. He interviewed Watkins at the police station from around midnight to about 1 a.m. on February 24. Exhibit 52 contained portions of the video of that interview; those portions were admitted into evidence during trial and played in open court. Around the same time that Watkins was interviewed, Detective Marisa Boyce interviewed Cannon in a separate room. The general purpose of those interviews was to establish a timeline and discover any inconsistencies in the information gathered. After their interviews, Cannon and Watkins went home. Law enforcement, including Detective Skaar, searched and photographed Cannon's and Watkins' apartment from 2:08 a.m. to 2:50 a.m. on February 24, with Cannon's permission. At some point on February 24, Cannon also signed a form authorizing the release of all of R.W.'s medical records to Detective Boyce.

### (d) Subsequent Events

Thereafter, Cannon and Watkins were separately questioned by law enforcement a second time. Cannon was released after answering more direct questions from Detective Boyce. According to a "Rights Advisory Form" related to Watkins' second interview, Detective Skaar interviewed Watkins on February 25, 2018, from around 6:20 p.m. until 9:12 p.m. after Watkins waived his *Miranda* rights. Over Watkins' counsel's objection, the rest of exhibit 52 was admitted into evidence and played in open court; it showed portions of the video of Watkins' second police interview. During that interview, Watkins denied that anyone was abusing R.W. and A.W. in his and Cannon's apartment. He said he and Cannon loved their children. Sometime after the second interview, Watkins was arrested.

Cannon's relationship with Watkins ended in February 2018, around the time that R.W. and A.W. were injured. R.W. and A.W. were in foster care with Johnson from that February through March 2019, when they were returned to Cannon's care. Johnson continued to provide daycare for R.W., A.W., and Cannon's other child.

### 3. VERDICT

The matter was submitted to the jury on August 1, 2019. On August 2, the jury found Watkins guilty of count 1. However, the jury informed the district court that it could not reach a unanimous verdict as to count 2. The district court accepted the jury's verdict, and a judgment on conviction was entered on August 5 finding Watkins guilty of count 1 and declaring a mistrial as to count 2.

### 4. SENTENCING AND APPEAL

On October 8, 2019, Watkins was sentenced to 20 to 25 years' imprisonment. He was given credit for 590 days' time served. On the State's motion, count 2 was dismissed.

Watkins appeals.

## III. ASSIGNMENTS OF ERROR

Watkins claims that (1) the district court erred by admitting exhibit 52 as it contained statements that were not relevant and were unduly prejudicial to him, (2) the evidence was insufficient to find him guilty beyond a reasonable doubt of child abuse resulting in serious bodily injury, and (3) the district court abused its discretion by imposing an excessive sentence.

## IV. STANDARD OF REVIEW

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *State v. Lierman*, 305 Neb. 289, 940 N.W.2d 529 (2020). Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion. *State v. Lierman, supra.*

In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of the witnesses, or reweigh the evidence; such matters are for the finder of fact. *Id.* The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *Id.*

## V. ANALYSIS

### 1. ADMISSIBILITY OF EXHIBIT 52

Watkins claims that the district court erred by admitting approximately 16 seconds of exhibit 52 into evidence as it contained statements that were allegedly irrelevant and unduly prejudicial to him.

During trial, outside the jury's presence, the parties discussed the State's intent to offer exhibit 52, which contained parts of the video of both of Watkins' police interviews. Under relevancy and prejudicial grounds under "403," Watkins' counsel specifically objected to the admissibility of Detective Skaar's statements in three exchanges from the second interview. The objection was overruled. The State later successfully offered exhibit 52 through Detective Skaar's testimony, over defense counsel's renewed objection. Before the portions of the video of the second interview were played, the district court admonished the jury, in relevant part, that "[Detective] Skaar's statements made during the interview are offered only and solely to provide context to Watkins' statements. [Detective] Skaar's statements during the interview are not offered for the truth of the matter asserted. Only Watkins' statements made during the interview should be considered as evidence." At the end of trial, the court gave a substantially similar instruction to the jury.

Watkins argues that exhibit 52 was received in error due to it including Detective Skaar's statements during one of the three specific exchanges from Watkins' second interview on which the defense's objection was based during trial. The colloquy, about A.W.'s injuries, was as follows.

> Detective Skaar: You know what the doctors said? These are chronic injuries. These are chronic brain bleeds. These are things that are happening over a set amount of time in a pattern.
> Watkins: Ok and she's 4 months old? And so you're telling me--
> Detective Skaar: I think she's probably been abused since she came into the world.
> Watkins: No, no. . . . .

Watkins interprets Detective Skaar's statements as purporting that A.W.'s injuries happened "multiple times" in a pattern. Brief for appellant at 15. Dr. Books had indicated that A.W.'s skull fracture was caused not by her own movement but from some other force such as being thrown against a wall. In light of that testimony, Watkins argues that the detective's statements suggested that A.W. was thrown against a wall on multiple occasions even though there was "no expert evidence" to confirm that. *Id.* at 16.

Watkins argues that Detective Skaar's statements were not relevant due to their alleged inaccuracy, but at the same time he concedes that they served a "viable purpose" to provide a "context" or "bridge" between Watkins' statements. *Id.* Watkins asserts that the detective's statements were unduly prejudicial and presented a clear risk that the jury would reach a decision of guilt or innocence on "emotional grounds backed by little or no evidence." *Id.* at 17. Watkins' counsel did not object at trial to the adequacy of either limiting instruction noted previously. But Watkins now argues that the limiting instructions did not cure the admission of exhibit 52. The record does not show that the jury did not abide by the repeated instructions that Detective Skaar's

statements during Watkins' interviews were offered solely to provide context to Watkins' statements and that only Watkins' statements during those interviews were to be considered as evidence. Absent evidence to the contrary, it is presumed that a jury followed the instructions given in arriving at its verdict. *State v. Rocha*, 295 Neb. 716, 890 N.W.2d 178 (2017).

Nevertheless, we need not decide whether the disputed evidence was inadmissible for the reasons Watkins asserts. See *State v. Parnell*, 305 Neb. 932, 943 N.W.2d 678 (2020) (appellate court is not obligated to engage in analysis that is not necessary to adjudicate case and controversy before it). As we will explain, any erroneous admission of such evidence was harmless.

Harmless error jurisprudence recognizes that not all trial errors, even those of constitutional magnitude, entitle a criminal defendant to the reversal of an adverse trial result. *State v. Jennings*, 305 Neb. 809, 942 N.W.2d 753 (2020). It is only prejudicial error, that is, error which cannot be said to be harmless beyond a reasonable doubt, which requires that a conviction be set aside. *Id.* When determining whether an alleged error is so prejudicial as to justify reversal, courts generally consider whether the error, in light of the totality of the record, influenced the outcome of the case. *Id.* In other words, harmless error review looks to the basis on which the jury actually rested its verdict. *Id.* The inquiry is not whether in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the actual guilty verdict rendered was surely unattributable to the error. *Id.* Overwhelming evidence of guilt can be considered in determining whether the verdict rendered was surely unattributable to the error, but overwhelming evidence of guilt is not alone sufficient to find erroneous admission of evidence harmless. *Id.*

Detective Skaar's statements at issue clearly related to A.W.'s injuries, not those of R.W. Watkins was not convicted of child abuse resulting in serious bodily injury to A.W. under count 2. Watkins was convicted of child abuse resulting in serious bodily injury to R.W. under count 1. Detective Skaar's statements pertaining to A.W.'s internal head injuries had no evidentiary value as to whether Watkins was guilty of count 1 regarding a different victim who did not sustain any type of internal head injury. As we discuss next, there was an ample amount of other evidence upon which the jury could properly reach a guilty verdict on count 1. Watkins does not contest the admissibility of that evidence. His sole conviction was surely unattributable to the admission of the detective's statements at issue contained in exhibit 52. Accordingly, even if those statements were erroneously admitted, the admission of such evidence was harmless error.

## 2. SUFFICIENCY OF EVIDENCE

Watkins claims that his conviction was not supported by sufficient evidence. He was convicted of child abuse resulting in serious bodily injury to R.W. under count 1. As relevant, Neb. Rev. Stat. § 28-707(1) (Reissue 2016) provides that a person commits child abuse if he or she knowingly or intentionally causes or permits a minor child (a) to be placed in a situation that endangers his or her life or physical or mental health or (b) to be cruelly punished. Section 28-707(1)(a) and (1)(b) are alternative theories of child abuse. The jury was instructed that it could convict Watkins of count 1 under either of those theories. The judgment must be affirmed if the evidence was sufficient to support either of those alternative theories of guilt. See *State v. Knutson*, 288 Neb. 823, 852 N.W.2d 307 (2014). For the reasons that follow, we find that there was sufficient evidence presented to support Watkins' conviction under § 28-707(1)(a).

There was evidence that on February 22, 2018, Johnson did not notice any bruising on R.W. or anything abnormal about his behavior. She dropped off R.W. at Cannon's and Watkins' apartment at either 7 p.m. or about 8 to 8:30 p.m. Only Watkins was there. According to Johnson, Watkins was "under the influence." Cannon, who had been working, did not return to the apartment until about 3 to 4 hours later. Cannon saw from outside the patio door that Watkins was on the couch with a bottle of vodka. Photographs in evidence and testimony suggested that Watkins had been surrounded by two empty bottles of vodka and one empty beer can. Cannon never saw R.W.'s condition from after the time she entered the apartment that night through the next morning prior to when R.W. left for daycare. Johnson picked up R.W. at noon. That day, she discovered R.W.'s external injuries and witnessed R.W. vomit. After Johnson alerted the police, R.W. was taken to the hospital.

There are multiple photographs in evidence depicting R.W.'s bruised and otherwise injured skin from when he was in the hospital on or around February 23, 2018. They showed bruising or injuries to his forehead, arms, back, front torso, and on his hip and thigh area near his buttocks. Dr. Books thought a mark in the center of R.W.'s chest may have been from a cigarette burn due to its shape and scabbing along its perimeter. Cannon had noticed that mark on February 19 or 20, but had thought it was a "spider bite." But at the time Cannon noticed what she believed was a spider bite, R.W. did not have the several other injuries shown in photographs at the time he was later taken to the hospital. Various evidence showed that Watkins smoked cigarettes in February.

Dr. Books recalled that the bruising on R.W.'s lower abdomen, including a large bruise on the front side of R.W.'s body just below his ribcage, was concerning as it had to have been caused by a very high impact of force. Dr. Haney generally reiterated the same. One photograph of a bruise or mark on R.W. was described by Dr. Books as a "strange" triangular shape that looked like it had been caused by a belt or some other pointed object. Another photograph showed extensive "linear" bruises to the side of R.W.'s body; Dr. Books said those bruises were sometimes caused by hand. Another "linear" mark and bruising to the side of R.W.'s body could have been caused by a belt or a cord. Dr. Haney also described a photograph showing multiple "linear" marks all over R.W.'s back, which was suspicious because they indicated the child had been hit with a belt or some sort of linear object.

R.W. had sustained a rib fracture, pancreatic laceration, and liver damage. Dr. Books suggested that R.W.'s rib fracture was the result of being kicked or punched with a "very high force." The rib fracture was already healing. Dr. Books indicated the rib injury was from 3 to 10 days before February 23, 2018; Dr. Haney said it was "at least a week old." Dr. Books determined through blood testing that R.W.'s pancreatic injury was an "immediate" or more recent injury. According to Dr. Haney, the pancreas injury had been "relatively recent." Dr. Books determined that R.W.'s bruises were fresh given their color and Johnson's testimony about seeing R.W. on February 22. Dr. Haney opined that R.W.'s pancreatic laceration and liver damage were caused by blunt force trauma to his stomach, most likely at the same time. Dr. Books was certain that the type of bruising on R.W. was from child abuse and she believed that R.W.'s rib fracture and pancreatic laceration were the result of two separate events of child abuse. Dr. Haney concluded that all of R.W.'s injuries were the result of abuse.

Cannon testified that Watkins would sometimes become frustrated if R.W. cried too much. Regarding January and February 2018, Cannon recalled that Watkins physically disciplined R.W. by either "whoop[ing] him with his belt or with his hands." Watkins would "whoop" R.W.'s buttocks with a belt. If Watkins used his hand, he would hit R.W.'s buttocks or chest. During that time, Cannon saw Watkins discipline R.W. with a belt "at least maybe" three or four times. She would have seen Watkins strike R.W. with Watkins' hand "about maybe" five times. She identified exhibit 51 as Watkins' belt that he had used to strike R.W. Detective Skaar identified that belt as the one he took from Watkins after Watkins' second interview. The person who had lived above Cannon's and Watkins' apartment testified that in January and February she often heard crying from the apartment below. The person heard "crashing" as well as a raised male voice on multiple occasions typically during the late afternoon and into the evening coming from Cannon's and Watkins' apartment.

In the context of § 28-707(1)(a), "endangers" means to expose a minor child's life or health to danger or the peril of probable harm or loss. See *State v. Mendez-Osorio*, 297 Neb. 520, 900 N.W.2d 776 (2017). As pertinent, serious bodily injury means a bodily injury which involves (1) a substantial risk of death or (2) a protracted loss or impairment of the function of any part or organ of the body. See Neb. Rev. Stat. § 28-109(21) (Reissue 2016). The evidence clearly established that R.W.'s life or physical or mental health was endangered and that such endangerment resulted in serious bodily injury to R.W. Dr. Books described how a laceration to a pancreas was "very dangerous." One in five cases of trauma to the pancreas was fatal. Further, Dr. Haney opined that R.W.'s internal injuries had the potential to cause risk of death or a protracted loss or impairment of function of his body.

From the foregoing, when viewed in the light most favorable to the prosecution, a jury could reasonably deduce that Watkins had been under the influence of alcohol when Johnson turned R.W. over to his sole care on the evening of February 22, 2018, and that Watkins then knowingly or intentionally abused R.W. during the 3 or 4 hours that followed before Cannon returned home in violation of § 28-707(1)(a). See *State v. Blair*, 272 Neb. 951, 726 N.W.2d 185 (2007) (intent with which act is committed may be inferred from words and acts of defendant and from circumstances surrounding incident).

Watkins contends that the State was "unable to produce any direct evidence linking [him]" to the commission of count 1 and that he made no admission of guilt during his police interviews. Brief for appellant at 18. He believes there was "no way" from the doctors' testimony to determine who was caring for R.W. when R.W. was injured. *Id.* at 21. However, looking at the totality of the evidence, there was sufficient circumstantial evidence to support a conclusion that Watkins was the one who committed count 1 during a time when R.W. was in his sole care. See, *State v. Thelen*, 305 Neb. 334, 940 N.W.2d 259 (2020) (fact proved by circumstantial evidence is nonetheless proven fact; circumstantial evidence is not inherently less probative than direct evidence); *State v. Olbricht*, 294 Neb. 974, 885 N.W.2d 699 (2016) (evidence showing child was in defendant's sole care during time when child suffered injuries is circumstantial evidence from which it can reasonably be inferred that defendant caused such injuries, but proof of sole or exclusive care is not necessary prerequisite to proving child abuse). Watkins also points out that Cannon agreed that she had never seen Watkins do anything that would injure the children and that there were times

when she used physical discipline. But Watkins acknowledges Cannon's earlier testimony about how she had seen Watkins physically discipline R.W. before.

Watkins further complains that the OPD's investigation was "significantly compromised" for not obtaining the name and contact information of Johnson's adult daughter and for not ever speaking with her. Brief for appellant at 20. While Johnson ran her daycare alone, her daughter sometimes helped her with the daycare as needed such as with field trips. Johnson's daughter never had full responsibility of the children and never watched them alone. Johnson's daughter was present when Johnson spoke to law enforcement at her home regarding R.W. Officer Diaz did not speak with Johnson's daughter, did not know Johnson's daughter's name, and did not provide her identity to Detective Boyce. While Detective Skaar did not know Johnson had a daughter, he agreed that interviewing someone who helped out in the past on field trips and who arrived at Johnson's home later in the evening on the night R.W.'s injuries were discovered would have most likely not assisted him in the investigation or changed its outcome at all.

Watkins essentially asks this court to resolve conflicts in the evidence, pass on the credibility of the witnesses, and reweigh the evidence, but such matters were for the jury to decide. See *State v. Lierman*, 305 Neb. 289, 940 N.W.2d 529 (2020). As discussed, there was sufficient evidence presented to convict Watkins of child abuse resulting in serious bodily injury to R.W.

### 3. EXCESSIVE SENTENCE

Watkins claims that his sentence is excessive. He was convicted of count I, a Class II felony under § 28-707(1) and (7). A Class II felony is punishable by 1 to 50 years' imprisonment. Neb. Rev. Stat. § 28-105(1) (Supp. 2017). Watkins was sentenced to 20 to 25 years' imprisonment, with credit for 590 days' time served. His sentence is within the statutory limits.

Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether the sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed. *State v. Vanness*, 300 Neb. 159, 912 N.W.2d 736 (2018). When imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the violence involved in the commission of the crime. *State v. Lierman, supra*. The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id.*

The presentence investigation report (PSR) shows that Watkins was 25 years old at sentencing. He had graduated from high school and wanted to eventually study business and marketing. He had been employed in the past. He had seven children from five different mothers. R.W. and A.W. were his youngest children. According to the PSR, Watkins did not have close relationships with his five older children and most of his criminal record was aggressive and violent in nature.

Watkins has a juvenile record. His convictions as an adult include shoplifting and failure to appear (2013), domestic violence assault in the third degree (twice; 2015 and 2016), assault and

battery (three convictions out of two separate incidents in 2016), and violation of a protection order (July 2018). The PSR indicates that the victim(s) of Watkins' domestic violence convictions were Cannon and/or a grocery store employee. Watkins received 16 days' jail time for his 2015 conviction; he was sentenced to 18 months' probation for his later domestic violence conviction, but his probation was revoked shortly thereafter and he was sentenced to 90 days in jail. Two of Watkins' assault and battery convictions were from when he punched his 9-year-old nephews multiple times for talking too loud; Watkins was sentenced to jail time and a term of probation but his probation was later revoked and he was sentenced to jail. Watkins' later assault and battery conviction involved him striking the faces of a female and a grocery store employee; Watkins was sentenced to 2 days in jail. For violating a protection order, which had been entered for the protection of Cannon, Cannon's oldest child, R.W., and A.W., Watkins was sentenced to 53 days in jail in July 2018. The PSR reflects that the mother of Watkins' oldest child had filed a protection order against Watkins in 2014; allegations include that Watkins had physically struck or pushed the mother and the child.

On a Substance Abuse Questionnaire, Watkins scored in the maximum risk range in the areas of truthfulness, alcohol, and violence. Watkins admitted that he had a drinking problem. He reported that he first drank alcohol when he was 9 years old. Prior to his arrest, there was only about a week where he would quit drinking, otherwise he was consistently using alcohol. He had gone to outpatient treatment for 14 to 15 months, once a week, but did not finish the program due to going to jail. He had been attending "AA" and "NA" meetings while incarcerated or on probation. He was involved with the "recovery mod" and had a "good support system." He planned to live with his mother upon release. Watkins positively described his mental health. He denied receiving a mental health diagnosis but later said he was on medication for two mental illnesses. According to the PSR, Watkins indicated he had given into aggressive urges or impulses that had led to the harm of others and the destruction of property. The probation officer who completed the PSR opined that Watkins would likely benefit from further mental health screenings and, possibly, treatment.

On a Level of Service/Case Management Inventory, Watkins scored very high risk in the domains of companions and procriminal attitude/orientation; high risk in the domains of criminal history, family/marital, leisure/recreation, alcohol/drug problem, and antisocial pattern; and medium risk in the domain of education/employment. His total score placed him in the very high risk range to reoffend. The probation officer who conducted Watkins' presentence interview thought Watkins was "too high of a risk for community supervision." A straight sentence was recommended as a way to hold Watkins responsible for his actions and teach him better ways to handle his anger. The sentence was recommended to be "above and beyond minimum guidelines" in light of the violence R.W. endured from Watkins.

The PSR includes Watkins' statement to the court. He said he did not know how A.W.'s or R.W.'s injuries happened. He said he had been drinking for the entire week. He admitted that he disciplined his children in different ways depending on their age. He suggested that he had used a belt to discipline R.W. The PSR noted that Watkins had said that once his children are old enough to walk, he will hit them with a belt. According to Watkins, "the only thing he ever did was

discipline his baby when it was necessary." He denied responsibility for his present conviction. He indicated that he sought a sentence of 3 to 6 years' imprisonment.

During the sentencing hearing, the district court noted that it had received the completed PSR. Watkins' counsel told the court that the defense disagreed with the jury's verdict. Watkins' counsel discussed how the PSR showed that Watkins had a "profound alcohol problem" and about how Watkins was physically disciplined as a child. Watkins' counsel believed those factors put Watkins at a social, emotional, and psychological deficit. Watkins' counsel requested the district court consider those deficits and give Watkins some leniency when crafting Watkins' sentence. After the State requested a straight sentence, Cannon spoke to the district court. She said that Watkins was a "very violent man." She indicated that R.W. was scared of Watkins. She hoped that Watkins would get the help he needed and take accountability for what he had done. Cannon did not want the district court to be lenient as to Watkins' sentence.

The district court had received two letters from Watkins' relatives from which it understood they wanted to "see only the good in their loved ones," but the court thought that his relatives were ignoring that Watkins was a "violent person who takes it out on children, in this case." The court noted that Watkins did not have any previous felony convictions, however, it also observed that Watkins had a fairly lengthy criminal history that was violent. Watkins had prior probation terms revoked twice due to violations. The court noted Watkins' age and his many children. Watkins "had ample opportunity to turn [his] life around and recognize [his] issues." The court understood how Watkins was raised and that how he disciplined his children was a "learned character trait." But that did not excuse Watkins' actions. The court stated, "You could have killed both kids." The court reflected on the severity of R.W.'s and A.W.'s injuries and how Watkins had shown no remorse for his behavior. The court was concerned that Watkins would repeat the offense unless he underwent therapy or counseling to address his "inner demons." It found that a significant sentence was warranted and that a lesser sentence would depreciate the seriousness of Watkins' offense.

On appeal, Watkins discusses his long history of having an alcohol addiction. He believes that based upon his addiction-related issues, it is understandable that he faced challenges in coping with the "stresses" of life. Brief for appellant at 25. Watkins notes his counsel's statements from the sentencing hearing about how he was physically disciplined as a child in a household that used "extreme corporal punishment." *Id.* at 25-26. He highlights information from the PSR regarding ways in which he says he took steps to "better" himself. *Id.* at 26. He states that the PSR reflected that he had self-awareness to identify issues with which he was dealing and that he was interested in rehabilitation. He believes the district court failed to "fully examine and adequately consider" the foregoing matters. *Id.* at 27. We find that the record does not support that assertion. Instead, the record reflects that the court considered and gave varying weight to relevant information from the PSR and the record as a whole. The record does not show that the court considered anything inappropriate. We cannot say that the district court abused its discretion when sentencing Watkins.

VI. CONCLUSION

We affirm Watkins' conviction and sentence.

AFFIRMED.