IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. TILKINS

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

KEVIN A. TILKINS, SR., APPELLANT.

Filed March 31, 2026.    No. A-25-526.

Appeal from the District Court for Buffalo County: JOHN H. MARSH, Judge. Affirmed.

Vikki S. Stamm, of Stamm Romero & Associates, P.C., L.L.O., for appellant.

Michael T. Hilgers, Attorney General, and Teryn Blessin for appellee.

RIEDMANN, Chief Judge, and BISHOP and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Kevin A. Tilkins, Sr., appeals from his convictions of assault by strangulation, third degree domestic assault, and two counts of child abuse. He contends that the evidence was insufficient to support his convictions, that the sentences imposed were excessive, and that his trial counsel was ineffective "in the presentation of [Tilkins'] case and failed to provide [Tilkins] information regarding defenses and possible outcomes of the case." For the reasons set forth herein, we affirm.

## II. STATEMENT OF FACTS

### 1. BACKGROUND

In October 2024, Tilkins and Carrie Kenniston had been in a relationship for about 7 years. The parties lived together with their three children and Kenniston's two teenage children from a previous relationship.

- 1 -

On the evening of October 23, 2024, after finishing her shift at a restaurant, Kenniston returned to the parties' home between 11 p.m. and 11:30 p.m. After arriving home, Kenniston began cleaning the house while Tilkins and the children slept. Tilkins awoke and asked Kenniston for the keys to the one vehicle owned by Tilkins but used by both parties. Tilkins grabbed at Kenniston's waist for the keys to the vehicle, but when he was unable to retrieve the keys from Kenniston, he used both arms to put her "in a headlock" or "choke hold." At some point, Kenniston's two older children, Katherine O. and Noah O., responded to the noise. At that point, Tilkins let go of Kenniston and she told the children to go back to their rooms. Tilkins eventually obtained the keys to the vehicle and attempted to drive away. Tilkins and Kenniston provided different versions regarding their additional confrontation while Tilkins attempted to leave with the vehicle.

Following the confrontations, Kenniston dialed 911 and reported the incident. Law enforcement responded to the home and eventually located Tilkins about six blocks away. Tilkins was eventually arrested and charged with assault by strangulation or suffocation, a Class IIIA felony; third degree domestic assault, a Class I misdemeanor; and two counts of child abuse, both Class I misdemeanors. The day after his arrest, Tilkins made a jail telephone call to his brother in which he stated, "I had her in a sleeper hold for about half-a-second."

During the final plea hearing in March 2025, defense counsel stated in open court that Tilkins had rejected a plea offer from the State. Then, during the April 2025 motion and status hearing, defense counsel notified the court that Tilkins had rejected the State's most recent plea offer, which provided that if Tilkins pled guilty to misdemeanor domestic assault, the State would dismiss the remaining charges. Following Tilkins' rejection of the State's plea offer, the case proceeded to a 2-day trial in late April 2025.

## 2. Trial

During the trial, the State adduced evidence including the facts as set forth above and called the following individuals as witnesses: Kenniston; Kenniston's two older children, Katherine and Noah; and several law enforcement officers. The defense called only one witness, Tilkins, who testified on his own behalf.

### (a) Kenniston's Testimony

Kenniston testified to the events of October 23, 2024, as previously set forth. Additionally, she stated that, when Tilkins placed her in a "headlock" or a "choke hold," she was unable to breathe. Kenniston stated that Tilkins let go of her momentarily after her two older children, Katherine and Noah, responded to the noise. Kenniston told the children to go back to their rooms. At that point Tilkins asked for the keys and Kenniston said "no" because she had personal items and car seats still in the vehicle and if Tilkins took the car seats, she had no way to transport the children. Kenniston explained that, in response to her not giving Tilkins the car keys, "[h]e started throwing things around the house and trashing the house that I had just cleaned. . . . He flipped the trash can upside down. He started pulling things out of my many drawers in my desk, [and] dumping them all over the floor." While doing this, Tilkins said, "Give me the keys or this is going to continue." Kenniston testified that Tilkins put her in a "choke hold" for a second time, during

which she "started getting weak in my knees. I could feel the ground beneath them. So I was standing when it happened and found myself on my knees."

At that time, Kenniston's oldest son, 13-year-old Noah, came into the living room and kept repeating "stop." However, Tilkins "just tightened his grip and choke hold and I started to lose consciousness." Kenniston described the sensation of losing consciousness as "I just remember starting to shake and everything around me started going black, and then after everything went black I just saw almost like lightning bolts – not even lightning bolts, just like foggy grayish." Kenniston testified that, at that point, she could not speak and could not breathe. When she regained consciousness, Tilkins was walking out of the house with the keys that he had taken from Kenniston's left front pants pocket. Kenniston told Noah, who was standing in the living room, to go back to his room.

Kenniston testified that she followed Tilkins outside to retrieve her personal belongings and the car seats from the car so she could take the children to school the next morning. Tilkins was in the driver's seat of the vehicle when Kenniston entered the front passenger seat. Kenniston stated that, prior to the car being placed in motion, she was able to remove some of the items from the vehicle, including the car seats. Once the car started moving, Tilkins drove around with Kenniston in the vehicle. She described Tilkins' driving as "erratic" with "[a] lot of swearing," and "[a] lot of intentional sharp turns." When the parties ended up back at their home, Tilkins told Kenniston to "get out" of the vehicle. According to Kenniston, after she did not exit the vehicle, they drove around again and Kenniston stated that Tilkins told her that "he was just going to take me out, beat the shit out of me, [and] leave me" and "that he wouldn't feel bad if he killed me. And that if anyone came asking questions about me, he would just say I never came home." The parties eventually ended up back at their residence again and, after the car was parked, Tilkins attempted to push Kenniston out of the passenger side door, but she grabbed the steering wheel. When Tilkins could not push Kenniston from the vehicle, he punched her arm six times, which she stated, "hurt a lot," with the pain lasting 3 days. Kenniston stated that she was covered in bruises, that she let go of the steering wheel and fell out of the vehicle, hitting her head and the back of her left shoulder on the ground. Tilkins left the home in the vehicle prior to law enforcement arriving at Kenniston's and Tilkins' shared home.

Kenniston testified that the day after the assault, she "spent eight hours in the hospital being tested, CAT scans, [and] X-rays." Kenniston stated that she had a "constant . . . very intense, [and] very sharp" pain in her head for 3 days, that she struggled to walk for 3 days, and that she was sore for about 7 days.

(b) Law Enforcement Testimony and Exhibits

Law enforcement officers took photographs of Kenniston's injuries, the state of the parties' living room, and the items that had been left in the parties' driveway. The photographs of Kenniston showed injuries to her neck, arm, and shoulder. The photographs of the parties' home showed a trash can tipped over with trash spilling out and books and toys spread across the floor. A police officer described the state of the home as "just trashed." Other photographs showed the items located in the parties' driveway that had been thrown out of the vehicle, including car seats, a stroller, and a case of bottled water with leaking water bottles.

### (c) Katherine's Testimony

Katherine O., who was born in 2008, testified that on the night of the incident, she was awakened by "the sound of crashing, stuff falling outside of my room," so she "got up out of bed to go and check," at which time she saw Tilkins "choking out [Kenniston] with his arm." According to Katherine, when she saw what was happening, she felt "[u]pset, concerned and confused" and her "main thoughts were to get her siblings out of the way so they did not get hurt by the situation." When asked why she thought that her siblings were at risk of being hurt, Katherine responded, "My younger siblings can be very up front with their emotions and if they see something they will end up acting on it, and I wanted to ensure that none of the younger ones would act on following their feelings by making sure they were out of the situation."

### (d) Noah's Testimony

Noah O., who was born in 2011, testified that on the night of the incident, he had been sleeping on the couch in the living room. He testified that "a few crashing noises and some yelling" woke him up. When he woke up, he saw Tilkins "holding my mom on the ground and yelling at her for some keys and making a mess." He described that Tilkins was holding Kenniston in "[k]ind of a choke hold," which he described as Tilkins having "one arm around her neck and one hand on her head." He expressed that seeing the incident made him "upset," "confused," and "pretty worried." He then saw Tilkins "[get] off of [Kenniston]" and "[Tilkins] started making a bigger mess by throwing a box of books," and then "went outside and started the car."

### (e) Tilkins' Testimony

Tilkins was the only witness for the defense. He testified that on the night of the alleged incident, while Kenniston was at work, he decided that he was going to break up with Kenniston because she took his vehicle to work without his permission. According to Tilkins, he had packed his bags so that he could leave when Kenniston returned home. When Kenniston returned home from work, Tilkins asked for his keys but Kenniston refused. At this time, Kenniston threw her craft supplies and Tilkins threw a box of books. At that point, Kenniston physically pushed him so he "put [Kenniston] in a two-arm Mandt restraint," which is a technique "designed to restrain people without hurting them." Tilkins testified that it was necessary to use the Mandt restraint because "when I was reaching for her keys in [Kenniston's] pocket, she became physically aggressive towards me." During the restraint, Kenniston

> picked her feet up, dropping her weight down, which is what caused the pressure to her neck. I let go immediately upon that happening. And then I took my keys out of her pocket while she was on the ground. It was at this point that . . . Katherine had walked out and [saw] me taking the keys from [Kenniston's] pocket.

Tilkins testified that while Tilkins had Kenniston in the "Mandt restraint," the trash can was knocked over.

After Kenniston was on the ground, Tilkins was able to grab the keys to the vehicle. According to Tilkins, "[a]s soon as I had the keys in my hand, I grabbed my bags and tried to get in the car and drive away before [Kenniston] could get to the car" but "[b]efore I could even get my luggage in the car, [Kenniston] was already there pulling out the car seats, which belonged to

me, among other things. The case of water was a part of that." Tilkins stated that he told Kenniston "to stop taking the car seats out of the car, that I would be back in the morning to bring the kids to school, and that it didn't need to escalate like this and that she just needed to let me go." Although Tilkins intended on driving away, Kenniston was in the car, "so we went for a drive and I tried to reason with her that the relationship was over."

During the drive, Kenniston attempted to convince Tilkins not to end the relationship, but he told her "that wasn't an option," which upset Kenniston. He contends that she grabbed a wrench from the back of the vehicle and

> was continuously threatening me with it. As I was driving, she was grabbing onto the steering wheel and yanking it trying to cause a crash.
>
> Every time she did, I would slow the vehicle to a stop and in the middle of the road until she let go of the . . . wheel so that . . . nobody got hurt and the vehicle wasn't in fast motion . . . while it was being jerked around. So . . . those behaviors led me to go back to the house really quickly and push [Kenniston] out of the vehicle.

Once they returned to the house, Tilkins testified that he

> pulled up on the side of the road, not in the driveway, put the car in park, reached over, opened her door from the driver's seat and pushed her out of the vehicle. She grabbed onto the steering wheel to not let me push her out of the vehicle while simultaneously swinging a wrench at me with the other hand.
>
> I knocked her hand off of my steering wheel with a push, not a punch. And it took several efforts . . . to get her hand off of the steering wheel, and then I pushed her out of the vehicle and drove away.

When asked about the jail telephone call in which Tilkins stated that he "had [Kenniston] in a sleeper hold for about half-a-second," Tilkins replied that he "was trying to say something to an ex-soldier to make it make sense to him, and not to a jury to make it make sense to them." He further testified that he did not intend to put Kenniston in a sleeper hold, which is a hold designed to make somebody unconscious. He further acknowledged the Mandt restraint does not resemble a sleeper hold. And, although Kenniston lifting up her feet does create a somewhat of a sleeper hold-type situation if he had not let go of Kenniston, "[a]s soon as I saw [that Kenniston] went down, the pressure was applied to her neck, I let go immediately."

On cross-examination, when asked if he lied to the police, Tilkins responded, "Yes. Police can't be trusted. They'll speculate on anything and take it into their own hands. It's not for them . . . to make the decisions that they make on a general basis" and "I wouldn't want the police to make a decision based on their own personal bias." When asked if that makes it okay to lie, Tilkins responded, "Yeah" and "[t]hey abuse their power."

### 3. JURY INSTRUCTIONS AND VERDICT

After the close of the evidence, during the jury instruction conference, defense counsel requested a self-defense instruction, which the court granted. Following closing arguments and jury instructions, the jury deliberated for 38 minutes before finding Tilkins guilty of all four charged offenses.

## 4. SENTENCING

During the sentencing hearing, defense counsel argued that Tilkins was an appropriate candidate for probation. The State disagreed, noting that throughout the presentence investigation report (PSR), Tilkins "takes zero responsibility for any of this, blames things on law enforcement, on the County Attorney's Office, [and] on Kenniston" and that Tilkins' comments throughout the PSR "are extremely concerning." During his allocution, Tilkins told the court, "I would like to say that I had a pretty hard day after my sentencing, and if I had the opportunity, I would handle the presentencing [interview] a little differently."

The court stated that it found substantial and compelling reasons why Tilkins could not be safely and effectively supervised in the community on probation and that a sentence of probation would depreciate the seriousness of Tilkins' conduct and promote disrespect for the law.

The court sentenced Tilkins to 18 months' imprisonment followed by 18 months of post-release supervision for assault by strangulation or suffocation and 1 year of imprisonment each for third degree domestic assault and the two convictions for child abuse. The sentences were all ordered to run concurrently and Tilkins was awarded credit for 6 days previously served. Tilkins has appealed and is represented on appeal by different counsel.

## III. ASSIGNMENTS OF ERROR

Tilkins assigns as error that (1) the evidence was insufficient to support his convictions, (2) the sentences imposed were excessive and the court should have sentenced Tilkins to probation, and (3) his trial counsel was ineffective "in the presentation of [Tilkins'] case and failed to provide [Tilkins] information regarding defenses and possible outcomes of the case."

## IV. STANDARD OF REVIEW

In reviewing a criminal conviction for sufficiency of the evidence, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. Scott*, 319 Neb. 153, 21 N.W.3d 490 (2025). The relevant question in reviewing a criminal conviction for sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Sutton*, 319 Neb. 581, 24 N.W.3d 43 (2025). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.*

Whether probation or incarceration is ordered is a choice within the discretion of the trial court, whose judgment denying probation will be upheld in the absence of an abuse of discretion. *State v. Senteney*, 307 Neb. 702, 950 N.W.2d 585 (2020).

Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal is a question of law. *State v. Vazquez*, 319 Neb. 192, 21 N.W.3d 615 (2025). In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not

prejudiced by counsel's alleged deficient performance. *Id*. The record on appeal is sufficient if it establishes either that trial counsel's performance was not deficient, that the appellant will not be able to establish prejudice as a matter of law, or that trial counsel's actions could not be justified as a part of any plausible trial strategy. *Id*. Conversely, an ineffective assistance of counsel claim will not be addressed on direct appeal if the record is insufficient to address it. *Id*.

## V. ANALYSIS

### 1. SUFFICIENCY OF EVIDENCE

Tilkins first contends that the evidence adduced at trial was insufficient to support his convictions and that the jury "simply misinterpreted" the evidence that was presented during the trial. Brief for appellant at 10.

Tilkins was convicted of assault by strangulation or suffocation, a Class IIIA felony; third degree domestic assault, a Class I misdemeanor; and two counts of child abuse, both Class I misdemeanors.

### (a) Assault by Strangulation or Suffocation

Pursuant to Neb. Rev. Stat. § 28-310.01 (Cum. Supp. 2024):

(1) A person commits the offense of assault by strangulation or suffocation if the person knowingly and intentionally:

(a) Impedes the normal breathing or circulation of the blood of another person by applying pressure on the throat or neck of the other person; or

(b) Impedes the normal breathing of another person by covering the mouth and nose of the person.

The intent with which an act is committed may be inferred from words and acts of defendant and from circumstances surrounding the incident. See *State v. Blair*, 272 Neb. 951, 726 N.W.2d 185 (2007).

Here, the evidence adduced at trial, when viewed in the light most favorable to the State, was that in the late evening hours of October 23, 2024, Tilkins intentionally placed Kenniston in a choke hold at least once and that Kenniston could not breathe and lost consciousness. Tilkins argues a conflicting view; that is, his testimony established that Kenniston instigated the aggressive contact between the parties and that while he was restraining Kenniston in an attempt to retrieve his car keys from her, "she picked her feet up causing all her weight to drop down and cause pressure to her neck," at which time "he immediately let go." That assessment is essentially a request for this court to reweigh the evidence. That is not the province of this court. This court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence, which matters are for the finder of fact. See *State v. Cerros*, 312 Neb. 230, 978 N.W.2d 162 (2022). Viewing the evidence in the light most favorable to the State, we find that there was sufficient evidence to sustain Tilkins' conviction for assault by strangulation or suffocation.

### (b) Third Degree Domestic Assault

In order to convict Tilkins of third degree domestic assault, as charged, the State was required to prove that Tilkins had intentionally and knowingly caused bodily injury to his intimate

partner or threatened his intimate partner with imminent bodily injury. See Neb. Rev. Stat. § 28-323 (Reissue 2016). An intimate partner includes persons who are or were involved in a dating relationship. *Id*.

Here, the evidence was undisputed that Kenniston and Tilkins had been in a relationship for approximately 7 years, lived together, and had three children together. Further, the evidence, considered in the light most favorable to the State, was that on the night of October 23, 2024, Tilkins placed Kenniston in a choke hold, Kenniston was unable to breathe, and it caused her to briefly lose consciousness. Further, Tilkins admitted that after returning to the parties' home after driving around, he pushed Kenniston out of vehicle. Officers took photographs, which were admitted into evidence, showing bruising on Kenniston's arm, a red mark under her jawline, and an abrasion on her shoulder. This evidence is sufficient to support Tilkins' conviction of third degree domestic assault.

(c) Child Abuse

We next turn to Tilkins' two convictions for child abuse. Tilkins argues that during the incident, he did not say anything to the children, he did not approach them, he did not touch them, and the situation was not dangerous to the children.

In order to convict Tilkins of the two counts of child abuse, as charged, the State was required to prove that Tilkins negligently caused or permitted a minor child or children, Noah and Katherine respectively, to be placed in a situation that endangered said child or children's life or physical or mental health, cruelly confined or cruelly punished said child or children or deprived said child or children of necessary food, clothing, shelter or care. See Neb. Rev. Stat. § 28-707(1)(a), (b) and (c) (Cum. Supp. 2024). When interpreting § 28-707(1), "'[t]riers of fact may apply to the subject before them that general knowledge which any person must be presumed to have.'" *State v. Thomas*, 25 Neb. App. 256, 265, 904 N.W.2d 295, 302 (2017), quoting *State v. Knutson,* 288 Neb. 823, 852 N.W.2d 307 (2014).

As relevant to Tilkins' convictions, the plain language of § 28-707 does not require evidence showing that either Katherine or Noah suffered actual harm or physical injury. It simply requires the minor child's physical or mental health be "endanger[ed]." Additionally, Tilkins' intent is not relevant, as his conviction was for negligent child abuse, a separate crime with a lesser punishment than intentional child abuse. See *State v. Thomas*, 25 Neb. App. 256, 904 N.W.2d 295 (2017).

Here, during the trial, Katherine testified that she witnessed Tilkins "choking out [Kenniston] with his arm" and Noah testified that he saw Tilkins "holding [Kenniston] on the ground and yelling at her for some keys and making a mess." Katherine stated that viewing the incident made her feel "[u]pset, concerned and confused" and her "main thoughts were to get the siblings out of the way so they did not get hurt by the situation." When asked why she thought that the siblings were at risk of being hurt, Katherine responded, "My younger siblings can be very up front with their emotions and if they see something they will end up acting on it, and I wanted to ensure that none of the younger ones would act on following their feelings by making sure they were out of the situation."

Given Katherine and Noah's ages, their proximity to the altercation, the fact that the children witnessed Tilkins holding Kenniston in a "choke hold," and the children describing that

the incident made them "upset" and "confused," as well as Katherine's belief that she needed to keep her younger siblings from seeing the incident and protect them from getting hurt, we find that a rational fact finder could find that Katherine and Noah's physical or mental health was endangered by Tilkins' actions.

## 2. EXCESSIVE SENTENCES

Having determined that the evidence was sufficient to support Tilkins' convictions, we turn to his second assigned error which is that the sentences imposed were excessive. Specifically, he contends that the court did not adequately consider his very limited criminal history, that he "was not . . . the instigator of this argument between the parties[,]" and that he should have been granted probation. Brief for appellant at 13.

Tilkins was convicted of assault by strangulation or suffocation, a Class IIIA felony; third degree domestic assault, a Class I misdemeanor; and two counts of child abuse, both Class I misdemeanors. See, § 28-310.01 (assault by strangulation or suffocation); § 28-323 (domestic assault); § 28-707 (child abuse). Between the time of Tilkins' sentencing and during the time that this case has been pending on appeal, § 28-105 was amended by 2025 Neb. Laws, L.B. 150, § 25, which became effective on September 3, 2025. The amended statute established lesser minimum penalties for Class IIIA felony convictions. Pursuant to the *Randolph* doctrine, when the Legislature amends a criminal statute by mitigating the punishment after the commission of a prohibited act but before final judgment, the punishment is that provided by the amendatory act unless the Legislature specifically provided otherwise. *State v. Chacon*, 296 Neb. 203, 894 N.W.2d 238 (2017). See, also, *State v. Randolph*, 186 Neb. 297, 183 N.W.2d 225 (1971).

For purposes of the *Randolph* doctrine, if a defendant appeals his or her sentence, then the sentence is not a final judgment until the entry of a final mandate. See *State v. Duncan*, 291 Neb. 1003, 870 N.W.2d 422 (2015). Here, because Tilkins timely filed an appeal and a final mandate has not yet been entered, he is entitled to receive the benefit of the lesser sentencing range. Neb. Rev. Stat. § 28-105 (Supp. 2025) provides that Class IIIA felonies are punishable by a minimum of no imprisonment and a maximum of 3 years' imprisonment followed by 0 to 18 months' post-release supervision and/or a $10,000 fine. Tilkins' sentence of 18 months' imprisonment followed by 18 months of post-release supervision is within the applicable statutory sentencing range.

Regarding the sentences imposed for third degree domestic assault and the two counts of child abuse, the district court sentenced Tilkins to 1 year of imprisonment for each conviction, which is within the statutory sentencing range for Class I misdemeanors, which are punishable by a minimum of no imprisonment and a maximum of 1 year of imprisonment and/or a $1,000 fine. See Neb. Rev. Stat. § 28-106 (Reissue 2016) (misdemeanors; classification of penalties).

It is well established that an appellate court will not disturb sentences within the statutory limits unless the district court abused its discretion in establishing the sentences. *State v. Morton*, 310 Neb. 355, 966 N.W.2d 57 (2021). When sentences imposed within statutory limits are alleged on appeal to be excessive, the appellate court must determine whether the sentencing court abused its discretion in considering well-established factors and any applicable legal principles. *Id*.

The relevant factors for a sentencing judge to consider when imposing a sentence are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural

background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime. *Id*. The sentencing court is not limited to any mathematically applied set of factors, but the appropriateness of the sentence is necessarily a subjective judgment that includes the sentencing judge's observations of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id*.

The presentence investigation report reflected that Tilkins is 35 years old, single, and has three children with Kenniston. He also has two additional children from a previous relationship, but his parental rights to those children were terminated. He graduated from high school and was employed. His criminal history includes convictions for disorderly conduct, possession of K2 or marijuana (1 ounce or less), possession of drug paraphernalia, and no proof of insurance. He also had a pending case for assault. Tilkins has not been sentenced to probation or sentenced to serve time in a correctional facility. The level of service/case management inventory assessed Tilkins as a medium high risk to reoffend. The domestic violence matrix assessed Tilkins as a high risk to reoffend. Additionally, Tilkins has not taken responsibility for the offenses, and in his written statement, he wrote that, "I was lied about by a woman to sexist cops [whose] mothers are surely disappointed. The Nazi DA took over from there." During the probation investigation interview, when the probation officer asked Tilkins about the current offenses, Tilkins stated, "I maintained my innocence taking my case to trial, made my case there and [I] don't feel like talking anymore [about] the offense will help." The probation officer noted that Tilkins "feels he was wrongfully charge[d] for the current offenses," Tilkins "appeared to place blame on the criminal justice system calling it 'corrupt and sexist,'" and that Tilkins

> blames the criminal justice system for allowing this to happen which will cause his children to grow up in a fatherless home. Overall[,] it was evidence [that Tilkins] does not take any responsibility for the current offense and instead appears to place blame on [Kenniston] and [the] criminal justice system.

The probation officer noted that
> it is evident [that Tilkins] appears to view himself as a victim stating he does not agree with his conviction[s]. He places blame on [Kenniston] and [the] criminal justice system. [Tilkins] does not appear motivated to work on any type of behavioral changes and does not appear interested in participating in probation.

And, when the probation officer asked Tilkins about his thoughts regarding sentencing, Tilkins stated, "I don't care what the Judge says. I need about 6 years to write my books anyways."

We note that Tilkins' claim that the court failed to properly weigh the relevant factors relating to sentencing is merely a request for this court to conduct its own de novo review of those factors. It is not the proper function of an appellate court to conduct a de novo review of the record to determine what sentence it would impose. *State v. Hagens*, 320 Neb. 65, 26 N.W.3d 174 (2025).

Based on factors including that the sentences imposed are within the applicable statutory sentencing ranges, Tilkins' risk to reoffend, his refusal to take responsibility for the offenses, his criminal history that demonstrates escalating criminal conduct, and the nature of the offenses, the sentences imposed were not an abuse of discretion. We further find that the court did not abuse its

discretion in sentencing Tilkins to a term of imprisonment rather than probation. This assignment of error fails.

### 3. INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

Tilkins' final assignment of error is that his trial counsel was ineffective "in the presentation of [Tilkins'] case and failed to provide [Tilkins] information regarding defenses and possible outcomes of the case."

As the Nebraska Supreme Court recently noted in *State v. Kruger*, 320 Neb. 361, 379-80, 27 N.W.3d 398, 417 (2025):

> When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record; otherwise, the issue will be procedurally barred in a subsequent postconviction proceeding. When a claim of ineffective assistance of counsel is raised in a direct appeal, the appellant is not required to allege prejudice.
>
> An alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court. Claims of ineffective assistance of counsel are no exception. On direct appeal in a criminal case, claims of ineffective assistance of counsel must be both specifically assigned and specifically argued in the appellant's brief.

Here, Tilkins' assignment of error that trial counsel was ineffective "in the presentation of [Tilkins'] case" fails to specifically identify how counsel performed deficiently in the presentation of the case at trial. Further, Tilkins' assignment of error that counsel "failed to provide [Tilkins] information regarding defenses and possible outcomes of the case" fails to identify what "defenses" or "possible outcomes" that defense counsel failed to provide or what information Tilkins needed regarding his defense.

We conclude that Tilkins has failed to allege his claims of deficient performance with sufficient particularity. A claim of ineffective assistance that is insufficiently stated is no different than a claim not stated at all. *State v. Drake*, 311 Neb. 219, 971 N.W.2d 759 (2022). Accordingly, we do not address this assigned error and this claim is not preserved for postconviction review. See *State v. Abdullah*, 289 Neb. 123, 853 N.W.2d 858 (2014) (claim insufficiently stated is no different than claim not stated at all, and insufficiently stated assignment of error and accompanying argument will not prevent procedural bar accompanying failure to raise all known or apparent claims of ineffective assistance of trial counsel).

### VI. CONCLUSION

Having found that the evidence supports Tilkins' convictions, that the sentences imposed were not excessive, and that Tilkins' assignment of error regarding ineffective assistance of counsel had not been sufficiently pled and was not preserved for postconviction review, we affirm Tilkins' convictions and sentences.

AFFIRMED.